**STATE of Missouri, Respondent,**

v.

**Ernest Lee JOHNSON, Appellant.**

**No. SC 87825.**

Supreme Court of Missouri,
En Banc.

Jan. 15, 2008.

As Modified on Denial of Rehearing
Feb. 19, 2008.

Elizabeth Unger Carlyle, Columbus, Mississippi, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Assistant Atty. Gen., Jefferson City, MO, for Respondent.

MARY R. RUSSELL, Judge.

This is the fourth time Ernest Lee Johnson comes before this Court. His original jury conviction of three counts of first-degree murder was affirmed, but his three death sentences were set aside and a new penalty-phase proceeding was ordered. *See State v. Johnson,* 968 S.W.2d 686 (Mo. banc 1998) (*"Johnson I"*).[1] In his second penalty-phase proceeding, three death sentences were again recommended by the jury and imposed by the circuit court; they were affirmed by this Court. *See State v. Johnson,* 22 S.W.3d 183 (Mo. banc 2000), *cert. denied,* 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000) (*"Johnson II"*). Those sentences were later set aside by this Court during his post-conviction appeal, and the case was remanded for a third penalty-phase proceeding because of incomplete evidence of his mental capacity, specifically, his alleged mental retardation. *Johnson v. State,* 102 S.W.3d 535, 537 (Mo. banc 2003) (*"Johnson III"*).[2] Following his third penalty-phase proceeding, the jury found that he was not mentally retarded, and three death sentences were again imposed. He now appeals. This Court has exclusive jurisdiction over this appeal. Mo. CONST. art. V, sec. 3. The judgment is affirmed.

---

1. The death sentences were set aside for failure of defense counsel to call a forensic psychiatrist who would have testified that Johnson had a mental disorder of cocaine intoxication at the time of the murder. *Johnson I,* 968 S.W.2d at 699.

2. Missouri defines "mental retardation" in section 565.030.6, RSMo Supp.2006. This statute, however, applies to crimes committed after August 28, 2001. Nevertheless, because of the holding in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that it is cruel and unusual to impose the death penalty on mentally retarded persons, this Court set forth a bright-line test stating that a defendant who can prove by a preponderance of the evidence that he suffers from mental retardation, as set out in 565.030.6, will not be subject to the death penalty. *Johnson III,* 102 S.W.3d at 540. Johnson was allowed to proceed with a third penalty-phase proceeding. All further references are to RSMo Supp.2006 unless otherwise indicated.

## I. Facts

In 1994 Johnson bludgeoned to death three employees of a Columbia convenience store using a hammer, a screwdriver, and a gun. The details of those crimes are set forth in *Johnson I,* 968 S.W.2d at 689–90.

## II. Burden of Proof—Mental Retardation

Johnson asserts that the trial court erred in instructing the jury that he had the burden of proving mental retardation by a preponderance of the evidence. The court submitted jury instruction MAI–CR 3d 313.38, which instructed the jurors that if they unanimously found by a preponderance of the evidence that Johnson was mentally retarded, then they must return a verdict for life imprisonment without eligibility for probation, parole, or release except by act of the governor. Johnson objected to this instruction, alleging that it violated his Sixth Amendment right because it should have been the State's burden to prove he was not mentally retarded. He submitted his own instruction providing that the State had the burden of proving beyond a reasonable doubt that he was not mentally retarded. The trial court declined to give his instruction because it was not in compliance with the MAI or Missouri law. *See* MAI–CR 3d 313.38 and section 565.030.4(1).

■■■ It is within the trial court's discretion to decide whether a tendered jury instruction should be submitted. *State v. Hartman,* 224 S.W.3d 642, 648 (Mo.App. 2007). A court is presumed to commit prejudicial error if it fails to use an applicable MAI. *See Hudson v. Carr,* 668 S.W.2d 68, 71 (Mo. banc 1984). If there is an applicable MAI–CR instruction, that instruction must be given to the exclusion of any others. *State v. Ervin,* 979 S.W.2d 149, 158 (Mo. banc 1998). If a proffered instruction is in conflict with substantive law, a court should decline to follow it. *State v. Carson,* 941 S.W.2d 518, 520 (Mo. banc 1997).

■■■ Under section 565.030.4(1), life imprisonment shall be assessed "[i]f the trier finds by a preponderance of the evidence that the defendant is mentally retarded." The statute necessarily implies that it is defendant's burden, not the State's, to prove to a jury that he is mentally retarded. It would be illogical for the State to be the proponent. If the jury finds by a preponderance of the evidence that the defendant is mentally retarded, it shall impose a sentence of life imprisonment. Johnson contends that based on the United States Supreme Court cases *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), this standard is incorrect, and the jury should have been required to find beyond a reasonable doubt that he is not mentally retarded before having the option of imposing the death penalty.

In *Atkins,* the Supreme Court held that the Eighth Amendment prohibits sentencing a mentally retarded offender to death because such punishment is excessive in that it does not advance the deterrent or retributive purposes of the death penalty. 536 U.S. at 321, 122 S.Ct. 2242. Although the Court set forth this basic standard, it did not articulate whose burden it was to prove mental retardation and, instead, left it to the states to develop appropriate ways to enforce this constitutional restriction. *Id.* at 317, 122 S.Ct. 2242.[3]

**3.** The Court's research reveals that no states follow the dissent's position of requiring the State to prove beyond a reasonable doubt that the defendant is not mentally retarded. Missouri follows 30 states in requiring that the defendant prove mental retardation. The

In *Ring*, the Supreme Court examined Arizona's statutory scheme that allowed a judge to determine the existence of a statutory aggravating circumstance, which was necessary to impose the death penalty on a defendant. 536 U.S. at 588, 122 S.Ct. 2428. The Court found that under the Sixth Amendment, such a finding must be made by a jury. *Id.* at 602, 122 S.Ct. 2428. It held that if a "State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt." *Id.*

■ Based on the holdings in *Atkins* and *Ring*, Johnson alleges that any facts that are necessary to put a defendant to death must be found by a jury beyond a reasonable doubt, and since the Eighth Amendment prohibits a mentally retarded offender from being sentenced to death, "mental retardation is now a factual issue upon which a defendant's eligibility for death turns." He contends that the prosecution must first prove lack of mental retardation beyond a reasonable doubt before he can be sentenced to death.

Johnson's claim is without merit. Under section 565.030.4(1), a finding of mental retardation is made by the jury and, if such a finding is made, the potential punishment for a capital defendant is limited to life imprisonment. Determining a defendant is mentally retarded is not a finding of fact that increases the potential range of punishment; it is a finding that removes the defendant from consideration of the death penalty. The Supreme Court's holding in *Ring* requiring a jury to find statutory aggravating circumstances beyond a reasonable doubt does not apply to the issue of mental retardation. The instruction the trial court submitted to the jury, MAI–CR 3d 313.38, is not in conflict with substantive law or *Ring.* The court did not err in instructing the jury that Johnson had the burden of proving mental retardation by a preponderance of the evidence.

### III. Directed Verdict—Mental Retardation

Johnson contends that the trial court erred in overruling his motions for directed verdict on the issue of mental retardation. He urges that the evidence he presented was sufficient to prove by a preponderance of the evidence that he is mentally retarded. As discussed earlier in section II, Johnson had the burden of proving by a preponderance of the evidence that he is mentally retarded. When he moved for a directed verdict at the close of the prosecution's case, he had not presented any evidence of mental retardation, much less established his claim as a matter of law.

The trial court did not err in overruling these motions.

following states have statutes requiring that the defendant or the proponent prove mental retardation: Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Louisiana, Maryland, Nebraska, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, Utah, Virginia, and Washington. *See Bowling v. Com.,* 163 S.W.3d 361, 382 (Ky.2005). Alabama, Kentucky, Mississippi, Ohio, Oklahoma, Pennsylvania, South Carolina, and Texas do not have statutes that address this issue, but their courts have held that the defendant is required to demonstrate that he is mentally retarded. *Id.; Ex parte State (In re Smith),* 2007 WL 1519869, —— So.2d —— (Ala.2007); *State v. Jimenez,* 188 N.J. 390, 908 A.2d 181 (N.J.2006). Connecticut's and Kansas's statutes do not state which party has the burden of proving that the defendant is mentally retarded. *Bowling,* 163 S.W.3d at 382. Montana, New Hampshire, Oregon, and Wyoming do not have any laws addressing this issue. The remaining 14 states do not allow for imposition of the death penalty.

## A. Standard of Review

 Johnson filed motions for a directed verdict. A motion for a directed verdict is not appropriate in a criminal proceeding. The proper motion in a criminal case is a motion for judgment of acquittal. Rule 27.07(a). This is anomalous in this case, as the issue relates solely to the punishment and not to Johnson's guilt for first degree murder. In essence, Johnson sought to have the trial court direct the jury to return a punishment of life imprisonment. Under these circumstances the Court will consider the substance of the motion rather than its label and review it as a motion for acquittal under Rule 27.07(a).

 In so reviewing the overruling of a motion for acquittal, the Court must determine if the State presented sufficient evidence to make a submissible case. *State v. St. George*, 215 S.W.3d 341, 345 (Mo.App.2007). The appellate courts must determine whether there is sufficient evidence from which a reasonable juror may have found the defendant guilty beyond a reasonable doubt. *Id.* The Court must view the evidence in the light most favorable to the judgment, disregarding any contrary evidence and granting the State all reasonable inferences from the evidence. *Id.* Deference should be given to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony. *Id.*

## B. Evidence Relating to Mental Retardation

Under Missouri law, "mental retardation" is statutorily defined as:

a condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

Section 565.030.6.

## 1. Subaverage Intellectual Functioning

Johnson's expert witness Dr. Keyes, a school psychologist, testified that to determine whether an individual has subaverage intellectual functioning, as required under section 565.030.6, individualized intelligence tests should be used to ascertain intelligence quotient ("I.Q."). Johnson presented evidence of multiple I.Q. tests that he had taken throughout his life, with scores of 77 in 1968,[4] 63 in 1972, 95 in 1979, 78 in 1994, and 84 in 1995.

After this case was remanded for a third penalty-phase proceeding to determine whether Johnson suffered from mental retardation, he was given two more I.Q. tests. The first test was given in December 2003 by Dr. Keyes, who, by his own admission, is not a clinical psychologist and is not qualified to diagnose mental defects other than retardation. Based on his testing, Dr. Keyes determined that Johnson had a full-scale score of 67, a verbal score of 69, and a performance score of 70. The second test that Johnson took was administered in July 2004 by a psychometrist, who worked for the State's expert, Dr. Heisler, a licensed psychologist. Based on this test, Johnson received a full-scale I.Q. score of 67, a verbal score of 67, and a performance score of 73. However, the jury heard testimony that Dr. Heisler be-

---

**4.** In 1968 Johnson was in the third grade and about eight years old.

lieved Johnson was "malingering." [5] Both Dr. Smith, a clinical psychologist and an addiction specialist who was also one of Johnson's expert witnesses, and Dr. Keyes admitted that, for the purposes of testing, an individual can fake having a lower I.Q. than he actually has. But Dr. Keyes stated that he did not think that Johnson was malingering.

At trial, Dr. Smith explained that an I.Q. score below 70 is indicative of mental retardation, whereas an I.Q. score of 77 is not. Dr. Keyes testified that an I.Q. score lower than 75 would raise concern about mental retardation. According to the Diagnostic and Statistical Manual of Mental Disorders IV (DSM–IV),[6] a person with an I.Q. of 70 or lower has significantly subaverage intellectual functioning, but it is possible for an individual with an I.Q. between 70 and 75 to be diagnosed as mentally retarded if they exhibit significant deficits in adaptive behavior. Additionally, as explained by Dr. Parwatikar, a forensic psychiatrist for the State who had evaluated Johnson in 1995 regarding his competency to stand trial, even though a person is found to possess below average intelligence, it does not necessarily mean that he is mentally retarded.

### 2. Adaptive Behaviors

Dr. Smith and Dr. Keyes both testified that Johnson had deficits in many categories of adaptive behavior. Both concluded that he had limitations in four of the nine adaptive behaviors that are identified under Missouri's definition of "mental retardation." These areas included communication, home living, social skills, and functional academics. Dr. Keyes further found that Johnson had deficits in community use, self-direction, health and safety, and leisure and work.

### a. Communication

Dr. Smith testified that Johnson had a very concrete understanding of verbal communication, but had difficulty with written communication. Johnson's ex-girlfriend testified, however, that he wrote to her frequently while he was in prison. Dr. Keyes stated that although Johnson's expressive communication was somewhat better than his receptive communication, Johnson had communication deficiencies. He conceded, however, that during his interview, Johnson was cooperative, friendly, had good verbal communication, and was oriented as to the time and place. But Dr. Keyes also testified that because communication is sometimes environmentally specific, he believed this behavior was a result of Johnson being in prison and that if he had not been in prison at the time his verbal skills may have been worse.

The jury also heard testimony from several more witnesses indicating that Johnson was able to communicate with others. The officers who interviewed him during the murder investigation stated that he conversed normally and he did nothing that indicated he did not know what he was being asked. The probation officer that Johnson was assigned to at the time the murders took place also testified that he was able to communicate with Johnson. One of the employees that worked for the convenience store Johnson robbed stated that Johnson had no problem communicating or making purchases when he came into the store prior to the murders. The

---

**5.** "Malingering" is defined as pretending to be "ill or otherwise physically or mentally incapacitated so as to avoid duty or work." WEBSTER'S NEW INT'L DICTIONARY 1367 (Unabridged 3d ed.1993).

**6.** The DSM–IV is the standard classification of mental disorders used by mental health professionals in the Untied States.

jury also had the opportunity to evaluate Johnson's ability to communicate with State's expert, Dr. Heisler, when it watched a one hour and 15 minute recorded interview from 2004.

### b. Home Living

When asked about any deficiencies Johnson may have had in home living, Dr. Smith said that he was not able to assess this type of adaptive behavior when Johnson was living in a cell. Yet, he still testified later that since Johnson predominately relied on the women in his life to perform home life functions, this was one of the categories in which Johnson had exhibited a deficit. Dr. Keyes believed Johnson to be deficient in this area since, at the time of the murders, he lived with his girlfriend, who paid the rent.

### c. Social Skills

Dr. Smith testified during direct examination that Johnson had the ability to form connections with people and had no limitations with regard to his social skills. He testified later during redirect, however, that Johnson has difficulty in his ability to interpret social situations and respond appropriately.

Dr. Keyes stated that he believed Johnson to be deficient in the area of social skills since he did not have any close friends. In forming his opinion, he used information that he learned from interviews with Johnson's brothers and sisters, all of whom said that when it came to socialization skills, Johnson's behaviors were severely deficient. Since Johnson's siblings provided this information knowing that their brother could be sentenced to death if he was not found to be mentally retarded, the jury may have doubted the accuracy of this testimony.

### d. Community Use

Dr. Smith testified that he believed Johnson had a deficit in community use. When asked what type of behavior led to this conclusion, he replied that Johnson had been unable to access treatment for his addiction because he did not know how to go about doing so. Johnson's parole officer and his pastor, however, both stated that he sought help from them for his alcohol and drug problems.

Dr. Keyes also testified that he thought Johnson to be deficient in this area. He based this opinion on the fact that Johnson did not use public transportation on his own, did not keep a job, and did not go out in the community to do things like see a movie or play golf. There was other testimony, however, that Johnson frequently visited and purchased items from the convenience store. Additionally, the day after he committed the murders, he called for a cab to go to the mall and used cash to purchase a piece of jewelry that he had previously looked at for his girlfriend for Valentine's Day. He also took a cab ride home, and he paid and tipped the driver in cash.

### e. Self–Direction

Dr. Keyes indicated that he believed Johnson was deficient in the adaptive behavior of self-direction, but during his testimony, he stated without explanation or example that Johnson's self-direction and motivation were "not good at all." Yet, Dr. Keyes later admitted that Johnson took logical, precise, intelligent steps to prepare, execute, and avoid apprehension for the murders. He stated this behavior indicated that Johnson was very goal-oriented in carrying out his plan. He explained, however, that because Johnson's actions violated the law, such behavior is not considered adaptive.

### f. Health and Safety

Dr. Keyes concluded that Johnson had a deficiency in maintaining a safe environment in that he did not live in an environment that was healthy where he ate properly, slept properly, had no drug involvement, and had hobbies that were not dangerous or illegal. Other evidence indicated, however, that Johnson did make attempts to maintain a safe living environment. Prior to committing the murders, Johnson sought help from his probation officer for his drug problem. While he was in prison, he asked to be placed in protective custody to avoid retaliation for a drug debt that he owed to another prisoner. In addition, when he was living at a halfway house in 1993, he successfully completed a substance abuse program.

### g. Functional Academics

Dr. Smith found that Johnson could do basic mathematics, but believed he was deficient in functional academics because he was very limited in his ability to do anything more complex, such as multiplication, division, long subtraction, or forming a budget. Dr. Keyes testified that although Johnson's academic work had succeeded somewhat, it was probably because he had been living in a highly structured environment for the last 12 years.

### h. Leisure and Work

When asked whether Johnson was deficient in the area of leisure and work, Dr. Smith stated that he did not know. Dr. Keyes found that he was deficient because drug use was his leisure activity. Dr. Keyes acknowledged, however, that Johnson used to enjoy horseback riding when he was younger. He also admitted that Johnson held a job while in prison. Johnson's probation officer testified that he was capable of working and that he had worked before, but he did not hold a job very long because he was not motivated to work. Dr. Keyes also believed that Johnson was not motivated to work.

### 3. Mental Retardation

Evidence was presented that Johnson was evaluated by a psychiatrist and two psychologists, all of whom had determined that he was not mentally retarded. Johnson was evaluated by Dr. Smith in 1996 and 1999 prior to earlier penalty-phase proceedings, and he likewise found that Johnson was not mentally retarded. However, prior to the third penalty-phase proceeding, Dr. Smith changed his mind and testified at trial that he believed Johnson suffers from mental retardation. In reaching this change of opinion, Dr. Smith did not reevaluate Johnson, but instead based his opinion on testing done by Dr. Keyes. Dr. Keyes did not evaluate Johnson until after the case was remanded for a third penalty-phase proceeding. He was the first mental health professional to diagnose Johnson as being mentally retarded.

Johnson's teacher testified that he was in special education classes from fourth grade through eighth grade; in ninth grade, he was placed on the basic track, which was for slower-ability children. However, none of these classes were for mentally retarded children. Several people who have known him throughout his life—his siblings, teachers, a former girlfriend, and others—gave testimony indicating that he was slow and often had a hard time learning things. Yet, Johnson was able to receive good grades in many of his special education classes.

### C. Discussion

■ The record in this case presents a substantial amount of conflicting evidence as to Johnson's claim that he is mentally

retarded. Of all of the experts that examined Johnson, only Dr. Smith and Dr. Keyes found that he was mentally retarded. Dr. Smith, who did not believe that Johnson suffered from mental retardation when he examined him in 1996 and 1999, changed his testimony after reviewing the tests Dr. Keyes conducted. Dr. Smith also admitted that the majority of the cases he had testified in were death-penalty cases and in the 40 times he had testified over the last 18 years, he had always been a witness for the defendant.

There were also legitimate concerns about Dr. Keyes's qualifications. First, he is a school psychologist. He works in the educational field and is trained to evaluate and diagnosis children who are no older than 22 years old. He is not qualified to diagnose mental diseases, and the only type of mental defect he is qualified to diagnose is mental retardation. Second, Dr. Keyes admitted that he makes about half of his income by testifying that a defendant is mentally retarded. He has never testified on behalf of the prosecution. Third, he did not become involved in Johnson's case until it was remanded for a third penalty-phase hearing on the issue of mental retardation, and he was the first person to conclude that Johnson was mentally retarded. Fourth, to test Johnson's adaptive behaviors, Dr. Keyes relied on anecdotes and stories about Johnson that he learned from Johnson's siblings, who knew that Johnson would not be sentenced to death if he were found to be mentally retarded. Thus, relying on Johnson's siblings for this information presented a con-

cern about bias. Finally, Dr. Keyes based many of his findings regarding Johnson's deficiencies in the areas of communication and self-direction on the fact that he was not able to hold a job. There was testimony, however, from several other witnesses that Johnson was capable of getting a job and it was his lack of motivation that led to his inability to remain employed.

In addition to the issues of credibility with both of Johnson's expert witnesses, the jury also heard evidence that Johnson had multiple I.Q. scores that were above the mentally retarded range and that his intellectual functioning was not subaverage. Furthermore, the jury had an opportunity to view an hour and 15 minute interview between the State's psychologist, Dr. Heisler and Johnson. The interview was conducted about 10 years after the murders, yet Johnson was able to recall many details of the crime and provide an explanation for the decisions he made.[7] There was also sufficient evidence presented at trial regarding his adaptive behaviors for the jury to conclude that he did not have continual deficits in two or more of the categories.

Because of this conflicting evidence, the trial court did not err in overruling Johnson's motions for a directed verdict. Deference should be given to the jury, and viewing the evidence in the light most favorable to the judgment, there was sufficient evidence from which a reasonable juror could have found that Johnson did not prove by a preponderance of the evidence that he suffered from mental retardation.

7. Johnson explained that he decided to rob Casey's because he needed money to buy more cocaine. He told Dr. Heisler that he wore two layers of clothing so he could remove the top layer after the robbery. When asked why he would do that, Johnson said he knew the people in the store would give a description of his clothing, so he did not want to be wearing the same thing. He also wore a mask so people could not see who he was. Johnson admitted that he was high on cocaine when he committed the murders. He did not, however, experience any blackouts, and he was aware of everything that happened during the robbery.

## IV. Directed Verdict— Life Imprisonment

Johnson alleges that the trial court erred in overruling his motions for a directed verdict of life imprisonment because the mitigating evidence outweighed the aggravating evidence as a matter of law, and thus, the evidence as a whole did not warrant imposition of the three death sentences. The standard of review is the same as previously discussed in point III.

During the penalty phase, Johnson presented evidence of many different mitigating circumstances. None, however, was so strong that a reasonable juror could have concluded that the evidence in mitigation outweighed the aggravating evidence. Johnson provided the jury with evidence of a very poor home life—he was abandoned by his mother when he was young, he was physically and sexually abused, and he was exposed to drugs and alcohol at an early age. Mitigating evidence of enduring an extremely difficult childhood is an insufficient basis to find that the imposition of the death penalty is unwarranted. *State v. Brooks*, 960 S.W.2d 479, 503 (Mo. banc 1997). Johnson's psychologist also testified that he allegedly suffered from fetal alcohol syndrome, yet the psychologist acknowledged that the "characteristics" he observed in Johnson were not conclusively fetal alcohol syndrome and could be indicative of other conditions.

Additionally, Johnson presented evidence that he was suffering from acute withdrawal from a cocaine binge at the time he committed the murders. Evidence of substance abuse can be seen as an aggravating circumstance rather than a mitigating circumstance by some jurors. *See Taylor v. State*, 126 S.W.3d 755, 763 (Mo. banc 2004). Further, there was evidence indicating that it was not an impulsive crime, but instead involved planning and forethought. Johnson had planned to hold up a convenience store for at least a month before he did so and committed the murders. He borrowed and test-fired the pistol that he used in the robbery. He also wore layers of clothing, which he could discard after the murders to prevent his identification.

Dr. Smith testified that Johnson's motivation for committing the crime was to get money to buy more cocaine. But the jury heard testimony that just hours after the crime, Johnson took a cab to the mall and used some of the money from the robbery to buy a diamond cluster ring for his girlfriend as a Valentine's Day present that he had been contemplating buying before the murders.

Johnson argues that even if the jury did not find him to be mentally retarded, he did have a diminished intellectual capacity, which affected his ability to function in society. Despite his assertion, this Court has upheld death sentences when a defendant has provided evidence of a low I.Q. *State v. Richardson*, 923 S.W.2d 301, 325 (Mo. banc 1996); *State v. Leisure*, 749 S.W.2d 366, 382 (Mo. banc 1988); *State v. Gilmore*, 681 S.W.2d 934, 940 (Mo. banc 1984); *State v. Shaw*, 636 S.W.2d 667, 672–73 (Mo. banc 1982).

Regardless of Johnson's contention that the jury was incorrect as a matter of law when it did not find that the evidence in mitigation outweighed the evidence in aggravation because of his background, impaired functioning, below average intelligence, and the influence he was under at the time of the murder, his argument is unsupported by the record. When examining the evidence in the light most favorable to the judgment, there was sufficient evidence from which a reasonable juror could have found that the mitigating evidence did not outweigh the aggravating

evidence. As a result, deference should be given to the jury, and the trial court was not in error when it overruled Johnson's motions for directed verdict.

## V. Removal of Veniremembers for Cause

Johnson alleges the trial court erred in granting the State's challenge for cause for prospective jurors Green, Leiter, Corcoran, and Alley. He argues that their views on the death penalty would not substantially impair their ability to participate in the deliberative process during the penalty-phase.

 The trial court's ruling on a challenge for cause shall not be disturbed on appeal unless it is against the weight of the evidence and constitutes a clear abuse of discretion. *State v. Taylor*, 134 S.W.3d 21, 29 (Mo. banc 2004). A venireperson may be excluded from the jury if his view would substantially impair or prevent the performance of his duty as a juror. *Id.* If it appears that a juror cannot consider the range of punishment, apply the correct burden of proof, or follow the court's instructions in a murder case, then a challenge for cause will be sustained. *Id.* A juror's uncertainty about his ability to follow the law in a capital case along with an equivocal statement that he cannot sign a verdict of death can be a basis for the trial court to exclude him from the jury. *Id.* 29–30. Additionally, when there is ambiguity in a prospective juror's statements, the trial court, which is aided by its assessment of a juror's demeanor, is entitled to resolve the ambiguity in favor of the State. *Uttecht v. Brown*, — U.S. —, 127 S.Ct. 2218, 2223, 167 L.Ed.2d 1014 (2007).

### 1. Veniremember Green

 During voir dire, Green stated that she "would hesitate" voting for the death penalty. She explained that some of her fellow church members have a son who had been charged with murder, and she had witnessed the anguish they have been experiencing due to the possibility that he may be sentenced to death. When asked about this further, she admitted that she believed her ability to impose the death penalty would be substantially impaired.

Later during questioning, the prosecutor asked the panel if there was anyone who, because of their views on the death penalty, could never consider imposing a sentence of death. The following conversation ensued:

Green: I am just—I'd have to say yes.

[Prosecutor]: You'd say yes?

Green: Because of when you—You just convinced me when you said, "Could you stand up and pronounce the death penalty?" And I couldn't do it. I know I couldn't.

[Prosecutor]: Oh, could you sign the verdict form?

Green: Right. I couldn't do that.

[Prosecutor]: You could not act, if you were selected as the foreperson by the other jurors, you could not as the foreperson and sign that?

Green: That's what made me realize I could never do it.

[Prosecutor]: You couldn't sign a verdict of death?

Green: No

When Green was later questioned by defense counsel, she said that if the law told her she had to impose the death penalty, then she thought that she would be able to do it. However, she also admitted that "it would be very challenging" for her, she would be "biased," and that she would have hesitation in voting for the death sentence.

The State moved to strike Green for cause, and Johnson objected. In deciding

to sustain the motion, the court, the prosecutor, and defense counsel had the following discussion:

The Court: Well, I guess I have a question in my own mind as to what [defense counsel's] question was at the time, because—And I recall [Green's] answer being, "If I had to do it, I could do it." And I don't know if she was talking about signing the verdict form or—

[Defense Counsel]: I think she was.

The Court:—or rendering the death penalty.

[Defense Counsel]: I think she was talking about rendering the death penalty, Your Honor.

The Court: That's what I thought she was saying. You never have to.

. . . .

The Court: You never, ever have to under Missouri law.

. . . .

[Prosecutor]: She never came off the verdict form issue, even in the defense voir dire. And further, the State would certainly agree that the demeanor of all the jurors, as observed by the Court, should be taken into consideration. And she was clear in her statement that her ability to legitimately consider the death penalty would be substantially impaired.

The Court: Well, I agree. I'm going to sustain that challenge.

Throughout voir dire, Green made several statements indicating that she was not certain that she would be able to vote for the death penalty. She also stated that she would never be able to sign the verdict form to impose the death penalty. Although she said she would be able to impose a sentence of death if the law required it, the law does not require it. Based on Green's equivocation about her ability to impose the death penalty and the trial court's opportunity to assess her demeanor, the court did not abuse its discretion in sustaining the State's motion to strike Green for cause.

## 2. Veniremember Leiter

█ When the prosecutor asked Leiter if she could consider imposing the death penalty, she said that she has "a little difficulty with the death penalty" but that she "guess[ed]" she could consider it. She continued on to say that she did not think that her ability to seriously consider voting for the death penalty would be impaired, but she did not believe that she could be the one to sign a verdict recommending a sentence of death. When asked by defense counsel if she could serve on a jury that was considering death, assuming she was not the foreperson and did not have to sign off on the verdict, Leiter replied that she believed she could. She also stated that she believed that she could set aside her personal biases and be fair and impartial. However, when asked later whether she was leaning towards life without parole or death she said, "I would listen to the evidence, but I have to be honest and say that I would tend to lean for life." When questioned further, she went on to say that she "would try" to consider both punishments equally.

The trial court sustained the prosecutor's motion to strike for cause because Leiter explicitly stated that she did not believe that she could be the one who signed the verdict form if the jury imposed the death penalty. Since Leiter said she would have some difficulty imposing the death penalty, she would lean toward imposing a life sentence over death, and she could not be the one to sign a verdict sentencing Johnson to death, the trial court, aided by its assessment of her demeanor in resolving any ambiguity in favor of the State, did not abuse its discretion in

sustaining the prosecutor's motion to strike for cause.

### 3. Veniremember Corcoran

■ When questioned about her views on the death penalty, Corcoran told the prosecutor that the "evidence would have to be great" for her to be able to impose the death penalty. When she was asked additional questions, she said that based on her view of the death penalty, her ability to be impartial in deciding whether to impose a death sentence would be impaired. She also expressed concern that even after hearing all the facts, she did not know whether she could be swayed from her view. Corcoran elaborated in saying:

> My thoughts are, I don't like the idea of the death penalty. And I just don't know if I—if I would be impartial. I don't know. I think that I would, you know, after listening to all the evidence, I think that I could be impartial, but I can't say that I definitely would be, no.

Later, when the prosecutor asked her about whether she would hold the State to a higher burden of proof than beyond a reasonable doubt, Corcoran said, "Yes, because we're talking about someone's life." She explained that in her own mind, she "would have to know for sure."

When defense counsel later talked with Corcoran, she indicated that while her ability to impose the death penalty would be impaired, she could impose a sentence of death. She also agreed that she could follow the law and hold the State to its burden of beyond-a-reasonable-doubt instead of requiring it to prove more. Corcoran, however, later qualified this by saying, "for myself, I would just have to be completely convinced."

Because Corcoran indicated that she would require a higher burden of proof than beyond-a-reasonable-doubt in determining whether the State had met its bur-

den, the trial court sustained the State's motion to strike her for cause. In addition to Corcoran's inability to hold the State to the correct burden of proof, she also expressed doubt as to whether she would be impartial in considering the death penalty. The trial court did not abuse its discretion in sustaining the State's motion to strike.

### 4. Veniremember Alley

■ When the prosecutor asked Alley about whether she could impose the death penalty, she indicated that based on her religious views she was not sure that she would be able to. During further questioning, Alley agreed that if she had to, she would not be able to choose the death penalty. She explained that she could not say that someone would not be able to talk her out of that, but she had never had that happen. However, she also indicated that she had already made up her mind regarding the death penalty. Defense counsel later asked Alley if she really meant that she could never impose the death penalty, and her answer was, "Yes."

When the trial court asked if there was an objection to the State's motion to strike Alley for cause, defense counsel said that there was, "No objection." However, Johnson later raised this issue in his motion for new trial and in this appeal.

Since Alley stated several times that she could not impose the death penalty, the trial court did not abuse its discretion in sustaining the motion to strike her for cause.

The trial court, aided by its assessment of the prospective jurors' demeanor, is entitled to resolve any ambiguity in their statements in favor of the State. The court did not abuse its discretion in granting the State's challenge for cause to prospective jurors Green, Leiter, Corcoran, and Alley.

## VI. Crime Scene and Autopsy Photographs

Johnson argues that the trial court erred in admitting State's exhibits 34A–G, 39A–C, 41A–D, 69A–D, 70A–E, and 71A–C into evidence, because these crime scene and autopsy photographs were gruesome and meant only to inflame the jury. He contends that they had a prejudicial impact that contributed to the jury's imposition of the death sentences. He admits that the jury was entitled to know how the victims were killed so it could determine the existence of the statutory aggravating circumstances relating to whether he committed repeated and excessive acts of physical abuse. He contends, however, that the testimony of the medical examiner and other witnesses who saw the victims' bodies was sufficient to achieve this purpose. He asserts that the photographs should not have been admitted because their probative value was outweighed by the prejudicial effect they had on the jurors.

A trial court has broad discretion in the admission of photographs, and its decision will not be overturned absent an abuse of discretion. *State v. Strong*, 142 S.W.3d 702, 715 (Mo. banc 2004). A photograph is not inadmissible just because other evidence described what is shown in the photograph. *State v. Rousan*, 961 S.W.2d 831, 844 (Mo. banc 1998). Additionally, even if a photograph is inflammatory, it should not be excluded if it is relevant. Id. Generally, if photographs are gruesome, it is because the crime itself was gruesome. *Strong*, 142 S.W.3d at 715.

This case involved a retrial of Johnson's penalty-phase proceeding. These jurors had not participated in the guilt-phase proceeding, in which evidence of the crime, including photographs, had been admitted into evidence. They were aware that Johnson had been convicted of three counts of first degree murder, and it was their responsibility to determine punishment. Normally, jurors would have already seen evidence about his crime from the guilt-phase proceeding. However, since this was a retrial of the penalty-phase proceeding, the jury had no prior opportunity to see any prior evidence. During the retrial of the penalty-phase proceeding, the State had the burden of proving the statutory aggravating circumstances that were alleged in Johnson's case. One of these aggravators was whether the murders were "outrageously and wantonly vile, horrible, and inhumane," which required the jury to find that Johnson "committed repeated and excessive acts of physical abuse" that made each killing "unreasonably brutal."

Despite defense objection, the court admitted color photographs of the crime scene and the victims' bodies, both as they were found and after the autopsy. First, the jury was shown crime scene photographs depicting the area where the bodies were found in a bathroom and walk-in cooler. Photographs were shown of the victims' head wounds—so severe that the police initially believed they were inflicted with a shotgun, when in fact the victims were likely bludgeoned with a claw hammer found nearby. Second, the jury viewed autopsy photographs that, again, showed extensive head injuries consistent with being struck with a hammer and defensive stab wounds that matched a flathead screwdriver found in a nearby field.

The pictures were the only visual evidence that the jurors had to help them understand the nature of the crime and to decide whether the State had proved its case. Generally, gruesome photographs are admissible if they: (1) show the nature and location of wounds; (2) enable jurors to better understand the testimony at trial;

and (3) aid in establishing an element of the State's case. *State v. Mayes*, 63 S.W.3d 615, 631 (Mo. banc 2001). Because the photographs depicted the nature and extent of the victims' deadly wounds, aided in establishing an aggravating circumstance of the State's case, and helped the jury understand testimony, there was no abuse of discretion in admitting the photographs.

## VII. Constitutionality of Mitigation Instructions

Johnson contends that the trial court erred in overruling his motion requesting that the court refrain from giving jury instructions MAI–CR 3d 313.40 to 313.48 because these instructions did not permit the jury to give full consideration to mitigating evidence. Specifically, Johnson challenges three different instructions.[8]

The first jury instruction, based on MAI–CR 3d 313.40, requires jurors to consider whether one or more statutory aggravating circumstances existed. If the jury did not find beyond a reasonable doubt that there was at least one aggravating circumstance, then it was instructed to return a verdict of life imprisonment. The next instruction, which was patterned after MAI–CR 3d 313.41A, instructed jurors that if they found one or more statutory aggravating circumstances, they must decide whether there were facts and circumstances in aggravation of punishment that, taken as a whole, warranted the imposition of a death sentence. The final instruction, which was based on MAI–CR 3d 313.44A, stated that if the jury unanimously found that the facts and circumstances in aggravation of punishment, taken as a whole, warranted the imposition of a death sentence, then it must decide whether there were sufficient mitigating facts and circumstances to outweigh aggravation of punishment. If jurors find there are sufficient mitigating facts and circumstances, then they are required to return a verdict of life imprisonment.

Johnson did not request that the court refrain from giving any of the MAI–CR 3d penalty-phase instructions during the instruction conference. Because he failed to object to the instructions, this issue has not been preserved for appeal and can only be reviewed for plain error. *State v. Glass*, 136 S.W.3d 496, 507 (Mo. banc 2004).

Plain error requires a finding that the trial court's error resulted in manifest injustice or miscarriage of justice. *Hensley v. Jackson County*, 227 S.W.3d 491, 497 (Mo. banc 2007). To prove that an instructional error rose to the level of plain error, Johnson must demonstrate that the trial court so misdirected the jury that it is apparent that the instructional error affected the jury's verdict. *Id.* at 497–98. Johnson's main contention is that these instructions require the jury to focus exclusively on statutory aggravating circumstances and find that the evidence warrants the death penalty before examining mitigating evidence. He complains that the jury was essentially told to focus on the same aggravating evidence twice before being instructed to consider any mitigating evidence. Though he admits that both Missouri statutes and the United States Constitution require the jury to first consider whether a statutory aggravator exists, he alleges that MAI–CR 3d 313.41A, which sets forth when the jury may consider imposing the death penalty, was not necessary and was prejudicial.

---

**8.** He takes issue with nine instructions, but they are a set of three identical instructions for each of the three counts.

■ This Court has previously rejected this claim. In *State v. Middleton*, 998 S.W.2d 520, 530 (Mo. banc 1999), the defendant argued that MAI–CR 3d 313.41A was unconstitutional because it required the jury to first find that aggravating circumstances warranted the death sentence before considering mitigating evidence. Id. This Court disagreed and explained that the jury's finding that the death penalty is warranted is not the same as deciding it shall be imposed. Similarly, in *State v. Tokar*, 918 S.W.2d 753, 770–71 (Mo. banc 1996), the defendant contended that MAI–CR 3d 313.42B did not allow for the proper weighing of the aggravating circumstances with the mitigating circumstances.

MAI–CR 3d 313.42B, like MAI–CR 3d 313.41A, requires a jury to decide whether aggravating circumstances are enough to warrant the death penalty. In examining Tokar's argument, this Court found that under MAI–CR 3d 313.42B jurors did not need to consider mitigating circumstances unless they found that aggravating circumstances sufficiently warranted the imposition of the death penalty. MAI–CR 3d 313.42B does not ask a jury to *impose* the death penalty; it simply directs a jury to determine whether the aggravating circumstances are sufficient to *warrant* the imposition of a death sentence. As explained in *Tokar*, the language in this instruction is helpful to the defendant because it erects a barrier that must be passed before a jury can consider imposition of the death penalty. *Id.* at 771. Johnson's argument that the jury instructions in his case did not permit the jury to give full consideration to mitigating evidence is not meritorious, and there is no plain error.

## VIII. Constitutionality of Proportionality Scheme

Johnson alleges that this Court's scheme of proportionality review does not comply with the requirement of section 565.035.3(3), RSMo 2000, and thus, his death sentences are unconstitutional and must be vacated.[9] This claim was rejected in *Johnson II* and in similar claims in several other cases. *Johnson II*, 22 S.W.3d at 193; *State v. Johnson*, 207 S.W.3d 24, 49–50 (Mo. banc 2006); *Hutchison v. State*, 150 S.W.3d 292, 301 (Mo. banc 2004); *State v. Anderson*, 79 S.W.3d 420, 444 (Mo. banc 2002). In addition, the Eighth Circuit has addressed this issue and held that both Missouri's proportionality scheme and the statute that sets forth the requirements for review are constitutional. *See LaRette v. Delo*, 44 F.3d 681, 688 (8th Cir.1995).[10]

■ Furthermore, since this claim was previously raised and rejected in *Johnson II*, the law of the case doctrine applies. *See Johnson II*, 22 S.W.3d at 193. This doctrine, governing successive appeals, states that the same issues may not be relitigated in a subsequent appeal as the previous holding on those issues becomes the law of the case. *Laws v. State*, 183 S.W.3d 629, 633 (Mo.App.2006). Because Johnson previously asserted this argument in *Johnson II*, he may not raise it again in his current appeal, and this

**9.** Section 565.035.3(3), RSMo 2000 states that with regard to a death sentence this Court must determine whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant."

**10.** In *LaRette*, the court examined section 565.014.3, RSMo 1978. This section was repealed in 1983 and replaced by section 565.035.3, RSMo 2000, which contains substantially the same language.

Court's previous holding rejecting his argument controls.

## IX. Proportionality Review

■ Johnson asserts that his death sentences must be vacated because they are excessive and disproportionate to those imposed in other similar cases. This claim is addressed as part of this Court's independent proportionality review, which is intended to ensure against the "wanton" and "freakish" imposition of the death penalty. *State v. Edwards,* 116 S.W.3d 511, 548 (Mo. banc 2003); *See Kansas v. Marsh,* 548 U.S. 163, 126 S.Ct. 2516, 2541–42, 165 L.Ed.2d 429 (2006).

The Missouri legislature requires proportionality review in all death penalty cases and has set forth guidance for such review in section 565.035.3, RSMo 2000, which requires this Court to determine whether: (1) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) the evidence supports the finding of a statutory aggravating circumstance; and (3) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, strength of the evidence, and the defendant.

Johnson argues that the brutality of the crime, coupled with the presentation of the pictures from the crime scene and autopsy, makes it very likely that the imposition of the death penalty was not rational, but instead was a reaction to the horrific nature of the crime. As articulated above, there was no abuse of discretion in admitting the pictures. There is no evidence suggesting that the punishment imposed here was a product of passion, prejudice, or any other arbitrary factor.

Further, the evidence supported the findings of the following aggravating circumstances: (1) each murder was committed while Johnson was engaged in the commission of another unlawful homicide; (2) each murder was committed while Johnson was engaged in the commission of yet another unlawful homicide; (3) each victim was murdered for the purpose of receiving money or other things of monetary value; (4) each murder involved depravity of mind, and as a result thereof, was outrageously and wantonly vile, horrible, and inhuman; [11] (5) each murder was committed to prevent Johnson's arrest; and (6) each murder was committed while Johnson was engaged in a robbery.

■ Johnson urges this Court to find that the imposition of the death sentences is excessive and disproportionate. To determine whether a sentence of death is excessive or disproportionate, comparison is made to similar cases in which the death penalty was imposed. Section 565.035.3(3), RSMo 2000; *Lyons v. State,* 39 S.W.3d 32, 44 (Mo. banc 2001). As discussed in *Johnson II,* there are numerous cases where a sentence of death was imposed on defendants who murdered multiple people, or murdered for pecuniary gain, or to commit a robbery. *Johnson II,* 22 S.W.3d 183, 193 (Mo. banc 2000).

The death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. Johnson confessed to the crime. He deliberately bludgeoned and killed three convenience store employees while in the process of robbing the store. In this most recent penalty-phase proceeding, although Johnson presented evidence of mental retardation through the expert testimony of Dr.

---

11. The jury was instructed that it could make a determination of depravity of mind only if it found that Johnson committed repeated and excessive acts of physical abuse on his victims and the killings were therefore unreasonably brutal.

Keyes, the State presented evidence of subaverage intellectual functioning. The jury chose not to believe Dr. Keyes's conclusion that Johnson was mentally retarded.

## X. Constitutionality of Method of Execution

 Johnson argues that the trial court erred in denying his motion to preclude the State from seeking the death penalty because the method of execution prescribed by Missouri law constitutes cruel and unusual punishment in violation of the Missouri and United States Constitutions. This issue was addressed in *Johnson II*, 22 S.W.3d at 189. Although Johnson argued unsuccessfully at his original trial that Missouri's method of execution is unconstitutional, he failed to raise the issue in his original appeal. On appeal from his second penalty-phase proceeding, he raised the argument again, and this Court found that under the law of the case doctrine the trial judge's original ruling denying the matter controls. The law of the case also applies to this current appeal.[12] Johnson's claim is controlled by the trial judge's original ruling and he may not relitigate this issue.

Additionally, this Court has found that when an execution date has not been set, it is premature to consider a claim involving the method of execution, as the type of lethal injection that the State may use in the future is unknown. *See Worthington v. State*, 166 S.W.3d 566, 583 n. 3 (Mo. banc 2005). Johnson does not know his date of execution, and it would be premature to consider whether a particular

method of lethal injection violates the Eighth Amendment.

Finally, the Eighth Circuit recently held that the lethal injection procedures that Missouri proposes to use to carry out the death penalty are constitutional and not in violation of the Eighth Amendment. *Taylor v. Crawford*, 487 F.3d 1072, 1085 (8th Cir.2007).[13]

## XI. Conclusion

The judgment is affirmed.

PRICE and LIMBAUGH, JJ., and BARNEY, Sp.J., concur.

WOLFF, J., dissents in separate opinion filed; LAURA DENVIR STITH, C.J., and TEITELMAN, J., concur in opinion of WOLFF, J.

BRECKENRIDGE, J., not participating.

MICHAEL A. WOLFF, Judge, dissenting.

Legal procedure, including "burden of proof", may not seem that interesting to most people. But to Ernest Johnson, how the Court allocates the burden of proof is the difference between life and death.

This Court in *Johnson v. State*, 102 S.W.3d 535 (Mo. banc 2003) (*Johnson III*), determined that Johnson would not be subject to the death penalty if he could prove by a preponderance of evidence at a new sentencing phase trial that he is mentally retarded. The defendant in *Johnson III* did not raise the issue of allocation of the burden of proof in his points relied on, nor did the state address it. The alloca-

---

**12.** Appellate courts have discretion to consider the issue despite the law of the case doctrine if there is a mistake, a manifest injustice, or an intervening change of law. *State v. Graham*, 13 S.W.3d 290, 293 (Mo. banc 2000). No such situation occurred here.

**13.** The United States Supreme Court recently granted certiorari to *Baze v. Rees*, ––– U.S. –––, 128 S.Ct. 34, 168 L.Ed.2d 809 (2007), to consider the constitutionality of lethal injection.

tion of the burden of proof to the defendant was made by this court in the absence of statutory mandate and without considering the constitutional question presented here. I therefore consider the question of allocating the burden of proof to be open for full consideration in this appeal.

The Court's decision in *Johnson III* was intended to implement the principle established in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that it is unconstitutional for a mentally retarded person to be executed. In so holding, the Supreme Court of the United States in *Atkins* left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright,* 477 U.S. 399, 416–417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). This passage from *Atkins* is in a paragraph of the opinion that deals with how "mental retardation" is defined.[1] Nowhere in the opinion is there a discussion of which party should bear the burden of proving mental retardation or by what standard it should be proved.

Some states include the burden of proof in the statute that supplies the definition.[2]

Missouri's statute, section 565.030.6 [3], does not. Another subdivision, section 565.030.4(1), does provide that life imprisonment shall be assessed "[i]f the trier finds by a preponderance of the evidence that the defendant is mentally retarded." The statute does not specify whether the state or the defendant has the burden of proof on the issue.

Missouri's definition of "mental retardation"—enacted before *Atkins* but consistent with the Supreme Court's decision to leave the definition to the states—says "mental retardation" is "[a] condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age." Section 565.030.6.

Johnson's counsel argues that the state should have the burden of proving beyond a reasonable doubt that Johnson is not retarded in order for him to be subject to

---

1. The paragraph reads, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' *Id.,* at 405, 416–417, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335." *Atkins* at 317, 122 S.Ct. 2242.

2. For example, the Illinois statute provides, "[t]he issue of the defendant's mental retardation shall be determined in a pretrial hearing. The court shall be the fact finder on the issue of the defendant's mental retardation and shall determine the issue by a preponderance of evidence in which the moving party has the burden of proof. The court may appoint an expert in the field of mental retardation. The defendant and the State may offer experts from the field of mental retardation. The court shall determine admissibility of evidence and qualification as an expert." 725 Ill. Comp. Stat. 5/114–15(b) (2003).

3. All statutory references are to RSMo 2000.

the death penalty. Johnson's argument is based on *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in which the Court said that when the state "makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact ... must be found by a jury beyond a reasonable doubt." 536 U.S. at 602, 122 S.Ct. 2428.

The principal opinion in this case takes the position that the absence of mental retardation is not an element for the purpose of showing eligibility for the death penalty under *Ring.* Under this interpretation the state is not, therefore, required to prove the defendant's lack of mental retardation beyond a reasonable doubt. While the principal opinion's decision is consistent with the views of some other states [4], it seems inconsistent with *Ring.*

### A Matter of Life or Death

Allocating the burden to the defendant to prove that he is mentally retarded makes the decision—whether Johnson should receive the death penalty—seem capricious. The facts of this case show that the result—life or death—may well depend on which party has the burden of proof.

The evidence favoring Johnson's position is as follows: Johnson received three intelligence test scores indicating subaverage intellectual functioning. At the age of 12, Johnson received a score of 63 on the WISC test, a standard intelligence test for children. Two of the I.Q. tests Johnson took as an adult indicated that he had a full scale I.Q. of 67. Under the guidelines set forth in the Diagnostic and Statistical Manual of Mental Disorders IV, a person

with an I.Q. score below 70 has significantly subaverage intellectual functioning. The defense presented evidence that, as a child, Johnson was placed in special education classes, a placement consistent with a diagnosis of life-long mental retardation. Defense experts also testified that Johnson had deficits in many of the adaptive behaviors described in section 565.030.6, including communication, home living, social skills, community use, self-direction, health and safety, functional academics and leisure and work.

On the other hand, the state's evidence tending to show a lack of mental retardation is: Johnson received four I.Q. scores indicating an absence of mental retardation, including scores of 77 in 1968, 95 in 1979, 78 in 1994, and 84 in 1995. Dr. Heisler, the state's expert who administered one of the intelligence tests, testified that he believed Johnson's adult score of 67 was the result of malingering and not actual mental retardation. The state also contended that Johnson's functioning both in prison and prior to his incarceration indicate that he does not have adaptive behavior deficiencies.

The evidence in this case will support either conclusion. A reasonable jury, considering all the evidence, may be in equipoise. Johnson thus presents precisely the kind of case where the burden of proof is important, even determinative.

With the burden of proof by a preponderance of the evidence allocated to Johnson, as it is by the principal opinion, the jury's determination that Johnson is not mentally retarded is supported by evidence. If the burden were placed upon the state to show that Johnson is not

**4.** *Russell v. State,* 849 So.2d 95, 148 (Miss. 2003); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1015 (2002); *Murphy v. State,* 54 P.3d 556, 568 (Okla.Crim.App.2002); *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 211 (2003); *Franklin v. Maynard,* 356 S.C. 276, 588 S.E.2d 604, 606 (2003); *Ex Parte Briseno,* 135 S.W.3d 1, 12 (Tex.Crim. App.2004); *Bowling v. Commonwealth,* 163 S.W.3d 361, 382 (Ky.2005).

mentally retarded, the jurors may well have found the state's evidence insufficient to carry that burden over the evidence to the contrary. This may be so regardless of whether the burden is beyond a reasonable doubt, as in *Ring*, or by a preponderance of the evidence, as in section 565.030.4(1).

## The Rule of Lenity

The majority opinion contends that the language of section 565.030.4(1) "necessarily implies that it is defendant's burden, not the State's, to prove to a jury that he is mentally retarded." As noted, section 565.030.4(1) states that life imprisonment shall be assessed "[i]f the trier finds by a preponderance of the evidence that the defendant is mentally retarded."

The statute does not say whether the burden is on the state or on the defendant and is, therefore, ambiguous. Where there is ambiguity, the rule of lenity requires that the court strictly construe a criminal statute against the state. *State v. Hobokin*, 768 S.W.2d 76, 77 (Mo. banc 1989). Under the rule of lenity, criminal statutes may not be extended by judicial interpretation so as to embrace persons and acts not specifically and unambiguously brought within their terms. *State v. Salazar*, 236 S.W.3d 644, 645 (Mo. banc 2007) (citing *State v. Lloyd*, 320 Mo. 236, 7 S.W.2d 344, 346 (Mo.1928)). The rule of lenity is applicable to Johnson's case. Because section 565.030.4(1) does not specify which party must bear the burden of proving mental retardation by a preponderance of the evidence, the court must not infer, under the rule of lenity, that the law "necessarily implies" something that is not written in the statute. The ambiguity in the statute must be construed against the state. As such, the court should interpret the statute as placing the burden on the state.

Whether Johnson is subject to the death penalty or not—that is, whether he is mentally retarded or not—is almost certainly dependent upon where the burden of proof is allocated. *Ring* speaks of the state's burden to prove each fact upon which the defendant's punishment depends. Logically that would include the state's burden to show that Johnson is not retarded, in response to evidence that would indicate that he may be retarded. In other words, the evidence favoring Johnson establishes at least *prima facie* that he is retarded. Where that is the case, the burden should be on the state to prove that he is subject to the death penalty by bearing the burden of proving that he is not retarded. This would not oblige the state to prove lack of retardation in every death penalty case, but only in those cases in which the defendant introduces evidence that, if believed, would support a finding that he is mentally retarded. This is such a case.

## Conclusion

In the absence of controlling Supreme Court authority to the contrary, this Court should read *Atkins*—which set a substantive constitutional standard—with *Ring*, which established a constitutionally based procedural standard. When the constitution provides a substantive right, the state should not take away or diminish that right by its choice of procedure.

Johnson is entitled to a new penalty phase trial in which the state has the burden of proving that Johnson is not retarded and, thus, subject to the death penalty.

I respectfully dissent.