STATE of Missouri, Respondent,

v.

Richard D. DAVIS, Appellant.

No. SC 89699.

Supreme Court of Missouri,
En Banc.

June 29, 2010.

As Modified on Denial of Rehearing
Aug. 31, 2010.

Deborah B. Wafer, Public Defender's Office, St. Louis, for appellant.

Richard A. Starnes, Atty. General's Office, Jefferson City, for respondent.

LAURA DENVIR STITH, Judge.

Richard D. Davis was tried and found guilty by a jury of first-degree murder and multiple counts of first-degree assault, forcible rape and forcible sodomy in connection with the deaths of Marsha Spicer and Michelle Huff Ricci. In accordance with the jury's recommendation, the trial court sentenced Mr. Davis to death on the first-degree murder count involving Ms. Spicer. As to the remaining counts, the court sentenced Mr. Davis to 13 life sentences as a persistent sex offender, nine life sentences as a persistent offender, and two 15–year sentences as a persistent offender. For the reasons set forth below, this Court finds no reversible error in any of the points raised, finds that the sentence is proportional to the crime as required under section 565.035.3, RSMo 2000,[1] and affirms.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. General Background

The evidence at trial, considered in the light most favorable to the jury's verdict, *State v. Armentrout,* 8 S.W.3d 99, 102 (Mo. banc 1999), shows that on May 15, 2006, officers discovered a shallow grave in rural Lafayette County that contained the body

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

of Marsha Spicer. Police identified Richard D. Davis as a suspect in the Spicer investigation. On May 19, 2006, officers executed a search warrant on Mr. Davis' apartment and seized numerous items, among them a video camera and various videotapes, including tapes police designated as items 26 and 31.

Item 26 depicts footage of Mr. Davis and his girlfriend engaging in forced sexual acts with Ms. Spicer while her hands are bound with duct tape. It depicts Mr. Davis straddling Ms. Spicer's head and forcibly placing his penis in her mouth, punching Ms. Spicer in the side and stomach, and vaginally and anally raping Ms. Spicer as his girlfriend adjusted the camera angles. Item 31 shows Mr. Davis and his girlfriend performing forced sexual acts on a different victim, Michelle Huff Ricci. It depicts Ms. Ricci with her hands bound with yellow speaker wire. Portions of Item 31 show Mr. Davis vaginally raping Ms. Ricci while his girlfriend straddled her face, anally raping Ms. Ricci while forcing her face into his girlfriend's genitals, forcibly placing his penis in Ms. Ricci's mouth, and choking and striking Ms. Ricci on the head and back while she cried out in pain.

Police interviewed Mr. Davis. During the interview, Mr. Davis stated Ms. Spicer came to Mr. Davis' apartment and they had consensual sex for a while until Ms. Spicer said she wanted to leave. Then Mr. Davis and his girlfriend raped and sodomized Ms. Spicer. Initially, Mr. Davis claimed that Ms. Spicer accidentally suffocated to death while he and his girlfriend raped her. Mr. Davis eventually admitted, however, that he knew they were going to kill Ms. Spicer as soon as the sex "went too far," as he decided he could not allow Ms. Spicer to leave the apartment for fear that she would alert the authorities. After Ms. Spicer died, Mr. Davis and his girl-friend cleaned Ms. Spicer's body with bleach and dumped her in the shallow grave in Lafayette County.

During the interview, police also asked Mr. Davis about Ms. Ricci. Mr. Davis stated that Ms. Ricci willingly had come to his apartment and that the two of them as well as Mr. Davis' girlfriend had consensual sex. Eventually, Mr. Davis and his girlfriend tied up Ms. Ricci against her will and raped and sodomized her. Mr. Davis said he hit Ms. Ricci seven or eight different times and that he and his girlfriend tried to smother Ms. Ricci but she resisted too much.

Based on Mr. Davis' interview, the police seized more tapes that were hidden at Mr. Davis' workplace. These tapes, which the police labeled A, B, C and D, showed Mr. Davis raping, anally sodomizing and punching Ms. Spicer and Ms. Ricci. In addition to the rape and sodomy, Tape A showed Mr. Davis grabbing Ms. Ricci by the hair, holding her face to the camera and boasting about the control he had over Ms. Ricci. Tape B showed Mr. Davis' attempt to smother Ms. Spicer and threaten to crush her larynx if she complained. Tape C showed Mr. Davis' girlfriend sitting her naked body down on Ms. Spicer's face, smothering Ms. Spicer to death while Mr. Davis held Ms. Spicer down. Tape D showed Mr. Davis taunting and choking Ms. Ricci until she urinated.

The State filed a 26–count amended information charging Mr. Davis with first-degree murder for the death of Ms. Spicer as well as multiple counts of first-degree assault, forcible rape and forcible sodomy. On July 31, 2008, the jury found Mr. Davis guilty of all counts except one count of first-degree assault against Ms. Ricci.

During the penalty phase, the state submitted three statutory aggravators: (1) that he had one or more serious assaultive convictions; (2) that the murder of Ms.

Spicer involved depravity of mind; and (3) that the murder of Ms. Spicer occurred while the defendant was engaged in the perpetration of rape. The jury heard aggravating and mitigating evidence. After hearing all the evidence, the jury found all three statutory aggravators and recommended Mr. Davis be sentenced to death on the first-degree murder count. The trial court sentenced Mr. Davis to death in accordance with the jury's recommendation. He appeals his conviction and death sentence. Because the death penalty was imposed, this Court has exclusive jurisdiction. Mo. Const. art. V, § 3.

### B. Mr. Davis' Ake Claims

Mr. Davis was deemed indigent, and public defenders were appointed to represent him. Beginning in June 2007 and extending into July 2008, Mr. Davis filed numerous motions requesting the court to compel his counsel to conduct their legal strategy in the way he preferred or permit him to represent himself and provide him various resources.

On June 20, 2007, Mr. Davis filed a motion "to be my own lawyer." In that motion, Mr. Davis requested the court "to appoint someone to assist in investigating facts, deposing witnesses, gathering evidence, and to give [him] the means to represent himself." On June 25, 2007, Mr. Davis filed a motion stating, "If I can not have [counsel compelled to prepare the case according to Mr. Davis' instructions], then if it is true and I can be the so-called lawyer, and have access to assistance in doing the above then I want to do that and have access to law library, people to help investigate for me, witnesses, and help I will need for trial."

Mr. Davis filed an additional motion the next day making similar conditional requests. The following day, Mr. Davis filed two such motions. The first asked "for court to appoint investigator, legal assis-

tant to assist defendant in defending himself and investigating facts of the case," and for the court to appoint someone to help with legal research and in preparing his defense and for access to a VCR and unspecified "tapes of evidence that will be used in a suppression hearing and at trial." Mr. Davis did not state what he intended his defense to be; he said only that it would "require experts in medical drugs." The second motion asked the court to order Mr. Davis' attorneys to do certain things "or make Defendant his own lawyer and give him the help needed to find facts, investigate constitutional violations, secure evidence and prepair [sic] a very complex defence [sic]." He filed an additional motion July 10, 2007, in which he conceded that he already had some access to a law library but asked (as he previously had done) for more library access and for a right to "30 photocopies per hour if needed and a lawyer to assist [Mr. Davis] in representing [him]self and someone to help . . . investigate."

The court addressed these various motions at an October 10, 2007 hearing. Because Mr. Davis variously sought to represent himself and for the court to order counsel to continue representing him but to do so according to his legal strategy rather than that of counsel, the court first sought to clarify what relief Mr. Davis really wanted.

Mr. Davis at first responded, "I'll do it myself, I'll represent myself." He said he had thought it over and discussed it with his attorneys, that he was not intoxicated, could read and write English, and that no one was forcing him to decide to represent himself. The court asked Mr. Davis if he knew the rules of evidence and Mr. Davis said he would "try to learn it." The court continued, explaining that, without the assistance of counsel, Mr. Davis' pretrial options would be limited. The court re-

marked that the public defender's office has "money to send out investigators, they have money to take depositions for records, things of that nature." The exchange continued:

Court: "And do you understand that there's no absolute right in a lot of those things under the law for you to have? In other words, you would have to come up with the money for that. Do you understand that?"

Mr. Davis: "For like a, to talk to witnesses?"

Court: "Exactly. Do you understand that?"

Mr. Davis: "So, basically, I couldn't talk to witnesses or nothing?"

Court: "Well, there's certain things about witnesses where money is required, to send out investigators, to take a deposition of certain records that need to be taken or something. Do you understand that, obviously, those things cost money and you would have to obviously come up with that money?"

Mr. Davis: "No. That's one of the reasons I'm doing this, is because I was wanting this stuff done. And I thought that I could maybe do it myself, that I could question, you know, like, the police officers or witnesses in my case and prepare and learn, you know, what they was going to testify to and remembered."

Court: "Do you understand that that takes money to do that? Do you understand that when the public defender is taking depositions, they're paying for those depositions? Do you understand that?"

Mr. Davis: "I believed that you could, you know, help me, appoint someone, like, to investigate where I can't go talk to people and locate people."

Court: "I'm telling you up front, you understand, I have no power to do that.

I can't force people to work for free. Do you understand that?"

Mr. Davis: "Yes."

After this exchange, the court continued inquiring as to whether Mr. Davis wished to represent himself. After some further discussion, Mr. Davis decided to remain represented by appointed counsel. Thereafter, however, he periodically filed additional motions asking that he be allowed to represent himself for the reasons stated previously and stating that his counsel would not prepare the case in the way he desired. He always made these requests conditional on receiving things such as funding generally for pretrial investigations, defense and trial preparation, expert witnesses, and related expenses, as well as "cost for investigator to locate defense witnesses, secure evidences [sic], locate evidence, research defense issues" and "an investigator to locate witnesses, secure testimony and locate and secure physical evidence." These motions also stated that Mr. Davis wanted the court to provide funding for "copies of documents [and] discovery motions, [which] will be needed by defendant at great cost." Mr. Davis stated that he "will not be able to enter any evidence at a trial without funds to gather evidence" and that he would need telephone access because "[h]undreds of witnesses by the state have to have their testimony reviewed and some will need to be contacted." He also requested specific items such as "copy photos as exhibits;" "funds for transcripts;" "funds for photocopies in the law library;" "law books not in the law library;" and "funds to have photos copied or made off of D.V.D." Mr. Davis did not explain to what issues these requests related or whether they were necessary to present evidence about a significant issue in his case or if, instead, they were just general resources he wanted to have available as he might need them.

On July 7, 2008, the same day voir dire examination for Mr. Davis' trial began, he filed a motion to "proceed in forma pauperis" and stated for the first time that if "defendant had the ability he would have contacted expert witnesses ... on (Dissociative Identity Disorder) (DID) and the side effects of Lexapro and Paxil and other (4) four medications defendant was prescribed during the time relating to the charges." Mr. Davis also stated that he would "call witnesses who would testify to the (DID) and the fact that defendant had this disorder all his life." Mr. Davis would also "contact and call to court witnesses at his church who seen [*sic*] the (personality changes) (DID)."

On July 17, 2008, the trial court held a hearing to address Mr. Davis' latter motions. The court stated that it already had conducted a lengthy hearing on the matter of removing Mr. Davis' counsel. Mr. Davis said he was "under the understanding that [he] had th[e] right, to represent [him]self and to have funds to do that." The court asked whether there was any other thing Mr. Davis wanted to say "[o]n representing [him]self" Mr. Davis did not then make a record of what evidence he wanted to put on or what he needed the funds for or whether there was evidence to support a DID defense sufficient to justify hiring an expert. Instead, he focused on obtaining copies of prior motions he had filed and other collateral matters.

The jury began hearing guilt-phase evidence July 25, 2008. On July 30, 2008, in the middle of trial, Mr. Davis filed his "objections for the court, pro se." In that motion Mr. Davis objected to "not being allowed to represent myself, not given the means, or funding for basic materials, photo copies, law books, investigator to locate witnesses who would prove defense of (NGRI) (coworkers, friends, family). As stated in prior motions, witnesses who

would have testified at suppression hearing to prove the claims of illegal search and seizure, involuntary statements. As stated in my pro se motions, expert witness in regards to involuntary intoxication as stated in the pro se motion." The court overruled this motion.

### C. Colloquy Regarding Mr. Davis' Right to Testify

Before the parties rested in the guilt phase of Mr. Davis' trial, the court, out of the presence of the jury, examined Mr. Davis concerning his right to testify. The court explained that Mr. Davis had the right to testify but it understood that Mr. Davis was opting not to do so. Mr. Davis responded that he had never agreed not to testify—he wanted to "explain the last two months that [he] was out there." The court advised Mr. Davis that if he testified he would have to comply with the procedural rules of the court and his counsel would conduct the examination. Mr. Davis would not be allowed to "just sit there and tell the jury whatever he want[ed]." Mr. Davis inquired whether he could have counsel ask questions of Mr. Davis' choosing. The court said "no," and explained that selecting the questions to ask fell "under an attorney-client ... strategy, what the strategy of the case is." The court ordered a recess, allowing Mr. Davis time to discuss the matter with counsel. On returning from recess, the court reiterated to Mr. Davis that "it wouldn't be a situation ... where you will get on the stand and [Mr. Davis' counsel] would say, tell the jury what you want to tell them." When asked again whether he wanted to testify, Mr. Davis said, "I could not testify to anything I would want to testify to because the counsel would not ask the questions I wanted to ask." Thereafter, Mr. Davis stated that he did not want to testify in the guilt phase.

On August 5, 2008, near the end of the presentation of Mr. Davis' evidence in the penalty phase of his trial, the court again, out of the presence of the jury, examined Mr. Davis about his right to testify. Mr. Davis remarked that "you said I have the right to testify, but if I can't get my lawyer to ask me questions, then I have no right to testify." The court clarified, "today, if you're going to testify, it's going to be at the direction of your attorneys as to the questions that they deem are relevant, the questions that they know under the law the jury can hear, and things of that nature." Mr. Davis said that he understood, and the court again provided him with a recess to confer with counsel. When Mr. Davis returned from the recess, he said that he wanted to testify and asked the court, "Can I have them—ask them to ask questions of me?" The court agreed that Mr. Davis was free to give his counsel a list of questions he wanted to be asked but noted that "they might ask ... [different] questions, though, because they're making the decision of whether your questions are admissible or not admissible." The court gave Mr. Davis 15 minutes to write his questions. Afterward, Mr. Davis testified. Mr. Davis does not identify on appeal any questions he wanted asked that counsel did not ask of him.

### D. Voir Dire of Juror Powell

One of the jurors, Adam Powell, wrote in a pretrial questionnaire that the death penalty was used an "appropriate amount" and that he thought "most of the time the punishment fits the crime." Mr. Powell also checked boxes stating that he "somewhat favor[ed]" the death penalty and believed in the "eye for an eye" concept. Mr. Powell checked another box saying that he believed one's childhood experience "somewhat affects later behavior" and wrote that he believed "in some cases" the testimony of mental health professionals is "very necessary." Mr. Powell also wrote that mental health professionals "should be extended every right to assit [sic] in trial."

During voir dire, Mr. Powell said that he could vote for either death or life, had no preference for either sentence, would keep both options open, and, that, if he believed mitigating circumstances outweighed aggravating circumstances, he would vote for life. Mr. Davis' counsel asked Mr. Powell whether he was "willing to say that you could look at somebody's childhood experience and give that meaningful consideration as a reason to vote against the death penalty." Mr. Powell replied, "I'm willing to look at it, but I believe as an adult you're a person and no matter what happened in your childhood you know the difference between right and wrong and killing a person and not killing a person." The exchange continued:

Mr. Davis' counsel: "But from your world view it's not something that should be given meaningful consideration in deciding which punishment to give the deliberate murderer?"

Mr. Powell: "Again, I think that's so abstract. In some cases, yes, it could be, but I believe that most generally, no, as an adult human being you know that it's right to kill a person or not right or what your feelings are."

Mr. Davis' counsel: "And, again, sort of to follow up on your questionnaire—and this might sort of tie in what you've just told me—it's at least your philosophical belief that you do believe in the concept of an eye for an eye and a tooth for a tooth and a life for a life?"

Mr. Powell: "I believe in that in the context of the justice system, that if that is what is laid forth by the justice system and that's ordained how it works in a society, an orderly society, if that's what's rendered, I believe in that, yes."

Later, the State's counsel questioned Mr. Powell:

Prosecutor: "Mr. Powell, as I understand it, sir, while you generally are not going to give a great deal of weight to evidence of someone's childhood, for example, it is something that if the circumstances were appropriate, you would consider."

Mr. Powell: "Being that we're talking so vague, yes. I mean, I could see where there could be something that I would consider but generally no."

Prosecutor: "But it's a matter of weight, how much credit you would give it, if you will."

Mr. Powell: "Correct."

Prosecutor: "As opposed to being unwilling to consider it at all."

Mr. Powell: "Correct."

Afterward, Mr. Davis moved to strike Mr. Powell for cause on the ground that Mr. Powell essentially had stated that he could not give meaningful consideration to childhood experiences as a reason to vote against the death penalty. The court denied the strike. Mr. Powell served on Mr. Davis' jury as the foreman.

### E. Evidentiary Rulings

Prior to trial, Mr. Davis filed a motion to exclude as cumulative footage from the tapes of Mr. Davis' crimes against Ms. Spicer and Ms. Ricci seized from Mr. Davis' home and workplace—tapes 26, 31, A, B, C and D. The court overruled the motion. During general voir dire, Mr. Davis objected to the State's proposed use in opening statement of still photographs made from the tapes. The objection to the still photographs was overruled. The still photographs were shown to the jury during the State's opening statement and closing arguments in the guilt phase. Prior to opening statements, Mr. Davis renewed his objection to these still photographs and

renewed his motion to exclude the playing of the tapes. These objections were overruled but the court permitted a continuing objection to the still photographs. Before closing arguments in the guilt phase Mr. Davis renewed his objection to the State introducing the still photographs. The court overruled this objection. Footage from tapes 26, 31, A, B, C and D was shown to the jury via two DVDs consisting of approximately 90 minutes of footage edited together from the nearly seven and one-half hours of activity recorded on the tapes.

During the guilt phase of the trial, Detective John Howe testified generally as to the material on tapes 26 and 31. These tapes were admitted into evidence but were not played for the jury during the trial. Prior to Detective Howe's testimony, Mr. Davis moved to prevent Detective Howe from providing "a lot of specific detail about what is on those tapes," arguing that it would be unnecessarily repetitive to do so. The court told the prosecutor that Detective Howe could generally summarize what was on the tapes, but could not make legal conclusions. During Detective Howe's testimony concerning one of the tapes, Mr. Davis objected to the State "trying to repeat the same thing over and over again." The court overruled the objection, stating that the descriptions were general. Detective Howe later testified generally about tapes A, B, C and D. These tapes also were admitted into evidence but not played for the jury. Mr. Davis did not object specifically to these tapes or to Detective Howe's descriptions of these tapes.

At a later point in the guilt phase, video recordings of Mr. Davis' statements and admissions made during the police interview were admitted and played during the testimony of Detective Chris Rapp. Mr. Davis renewed his objection "for all the

grounds previously expressed in the motion to suppress." The court overruled the objection.

Mr. Davis did not present witnesses in the guilt phase but, instead, cross-examined the state's witnesses to show that the murder was not intentional but that Mr. Davis just got "caught up" in the moment.

In the guilt phase, the jury found Mr. Davis guilty of multiple counts of sexually assaulting Ms. Ricci. In the penalty phase, the State presented evidence that Mr. Davis and his girlfriend took Ms. Ricci to a remote area, killed her, and set her body on fire in an attempt to destroy evidence of her death. The State also showed that, while trying to escape arrest, they kidnapped a five-year-old child and sexually assaulted, sodomized and beat her. When Mr. Davis was arrested not long thereafter, the police overheard him telling his girlfriend, "We got to do some things we wanted." The State also presented evidence that Mr. Davis had previously raped and sodomized a woman at knifepoint, as well as evidence of other crimes.

Mr. Davis presented the testimony of a psychologist, Dr. Steven Mandracchia, in the penalty phase. Dr. Mandracchia evaluated Mr. Davis' mental condition at the time of the crimes and at trial and assessed whether developmental issues contributed to his conduct. The doctor testified that physical and sexual abuse, including beatings by his stepfather, and lack of interpersonal connections in Mr. Davis' family, as well as his exposure to inconstant adult figures, prevented normal development. Dr. Mandracchia testified that by the age of six, family members were setting up real or simulated sexual acts for Mr. Davis and his sister to engage in, and by age 10 he was engaging in sexual activity with a number of people. By age 15 regular sexual activity had become "routine," and he began becoming involved in anal sex, rough sex and group sex. An aunt made him engage in sexual activity with his sister. There was evidence indicating that Mr. Davis was molested by his stepfather. Medical records from the Western Missouri Mental Health Center showed that Mr. Davis was depressed, anxious, had low self-esteem, and his anger and his sexuality became associated. Dr. Mandracchia concluded that Mr. Davis had several severe personality disorders, including antisocial personality disorder, narcissism and paranoid personality disorder.

Mr. Davis testified in his own defense in the penalty phase. He said he was sorry for what he had done to his victims and explained about the history of abuse in his family. Mr. Davis also called a former girlfriend, another friend and his sister to testify on his behalf.

*F. Objections to the Jury Instructions and the Motion to Quash Mr. Davis' Information*

The amended information charged Mr. Davis with multiple counts of forcible rape, forcible sodomy, sexual abuse and first-degree assault against his two victims. To avoid confusion as to which count referred to which act, each count in the information contained a reference to a specific act recorded on one of the six videotapes recovered during the Spicer investigation. Similarly, each of the verdict-directing instructions submitted by the State included language that, also to avoid confusion, referenced one of the six tapes made by Mr. Davis. For example, Instruction No. 13 stated:

As to Count IV, if you find and believe from the evidence beyond a reasonable doubt: First, that on or about May 14, 2006, ... the defendant touched the

breast of Marsha Spicer as depicted in "Tape B" . . . .

At the guilt-phase instruction conference, defense counsel objected to each of these instructions on the ground that "language specifically pointing to a specific piece of evidence is prejudicial."[2] The State responded that the phrases were inserted in an effort to comply with the pattern instructions by directing the jury to the particular acts supporting each count. The trial court overruled defense counsel's objections, and the case was submitted using the State's verdict-directing instructions.

Also at the guilt-phase instruction conference, defense counsel objected that Instruction Nos. 70 and 71—which instructed the jury to determine whether mitigating circumstances outweigh aggravating circumstances—failed to place the burden on the State to prove that mitigating circumstances did not outweigh aggravating circumstances.[3] The court overruled the objections. Defense counsel also requested that the verdict-directing instruction for each of the 26 counts be modified so that the word "unanimously" would be added to the phrase "if you find and believe from the evidence beyond a reasonable doubt" to return a guilty verdict on that count. For example, Instruction No. 5, as modified, would have added the word in brackets and read:

> As to Count I, if you [unanimously] find and believe from the evidence beyond a reasonable doubt: . . . . However, unless you [unanimously] find

. . . .

The court rejected the proposed modification to the language contained in the approved pattern MAI–CR 3d 304.02 format for verdict-directing instructions.

On the last day of the guilt phase of Mr. Davis' trial, Mr. Davis moved to quash the information, claiming that it violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in that the State was obligated to list in the information all of the statutory aggravators it sought to prove regarding Mr. Davis' first-degree murder count but had failed to include them. The trial court overruled this motion.

## II. STANDARD OF REVIEW

The evidence is reviewed in the light most favorable to the verdict. *State v. Strong*, 142 S.W.3d 702, 710 (Mo. banc 2004). Mr. Davis argues on appeal that the trial court deprived him of his right to represent himself. "Denial of a defendant's right to self-representation is considered structural error," *State v. Black*, 223 S.W.3d 149, 153 (Mo. banc 2007), and "its deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Mr. Davis also appeals the trial court's denial of his attempt to strike Juror Powell for cause. A ruling on a challenge for cause shall not be disturbed on appeal unless it is against the weight of the evidence and constitutes a clear abuse of

---

2. Mr. Davis objected to the following verdict-directing instructions: for Count IV—Instruction No. 13; Count V—Instruction No. 15; Count VI—Instruction No. 17; Count VII—Instruction No. 19; Count VIII—Instruction No. 21; Count IX—Instruction No. 23; Count XIII—Instruction No. 31; Count XIV—Instruction No. 33; Count XV—Instruction No. 35; Count XVI—Instruction No. 37; Count XVII—Instruction No. 39; Count XVIII—Instruction No. 41; Count XIX—Instruction No. 43; Count XX—Instruction No. 45; Count XXI—Instruction No. 47; Count XXII—Instruction No. 49; Count XXIII—Instruction No. 51; Count XXV—Instruction No. 55; Count XXVI—Instruction No. 57.

3. *See* § 565.030.4(3).

discretion. *State v. Johnson*, 244 S.W.3d 144, 158 (Mo. banc 2008).

 Mr. Davis alleges error in admitting certain evidence and submitting certain instructions. A trial court's evidentiary rulings are reviewed for abuse of discretion. *State v. Simmons*, 955 S.W.2d 729, 737 (Mo. banc 1997). "A trial court's decision to admit evidence is an abuse of discretion when it is clearly against the logic of the circumstances then before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *State v. Smith*, 136 S.W.3d 546, 550 (Mo.App.2004). "It is within the trial court's discretion to decide whether a tendered jury instruction should be submitted." *Johnson*, 244 S.W.3d at 150. However, a "court is presumed to commit prejudicial error if it fails to use an applicable MAI." *Id.* "If a proffered instruction is in conflict with substantive law, a court should decline to follow it." *Id.*

Finally, in reviewing the imposition of a death sentence, section 565.035.3 requires this Court to undertake a proportionality review to determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

## III. DISCUSSION

### A. No Ake or Faretta Violation Shown

### 1. No Cases Hold a Misstatement of Ake Constitutes a Faretta Violation Where a Defendant Chooses Not to Represent Himself.

Mr. Davis argues that the trial court misstated the law about what "basic tools" of an "adequate defense" he would be entitled to receive from the State under the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), should Mr. Davis choose to represent himself. He says this misstatement caused him to decide to withdraw his attempt to waive his right to counsel and represent himself, a right he is entitled to under *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (recognizing a Sixth Amendment right to self-representation). Therefore, he argues, this Court should find the alleged misstatement of his rights under *Ake* resulted in a violation, not of *Ake* but of *Faretta*, in that it meant that his decision not to represent himself was not made knowingly and intelligently.

The argument that an error in explaining Mr. Davis' right to basic tools of a defense under *Ake* itself can constitute a violation of *Faretta* is a novel and creative one, but Mr. Davis cites no case decided under either *Faretta* or *Ake* that supports it, and this Court has found none.

In *Faretta*, 422 U.S. at 833–34, 95 S.Ct. 2525, the Supreme Court held that the Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees criminal defendants the right to self-representation at trial. So long as the defendant unequivocally invokes the right to self-representation, does so in a timely manner, and the corresponding waiver of counsel is knowing and intelligent, a trial court may not force an attorney on a competent defendant. *Black*, 223 S.W.3d at 153. To ensure a knowing and

intelligent waiver of counsel, this Court has stated that trial courts must engage in a colloquy with the defendant to make certain the defendant understands "exactly what rights and privileges he is waiving, as well as the dangers associated with waiving constitutional rights." *Id.*

No court has held either that the *Faretta* colloquy must include a discussion of what basic "tools of a defense" the constitution requires states to provide defendants or that the failure to do so accurately, or even at all, constitutes a violation of *Faretta.* This is not surprising, for, as set out below, only a handful of courts even have suggested that *Ake* entitles defendants who are representing themselves to demand to be provided the tools necessary for a defense personally when they have chosen to reject the right to have those tools provided through counsel.

Mr. Davis is forced to make this creative argument, however, for he cannot show a violation of *Faretta* directly. The court's colloquy met the requirements of *Faretta,* and Mr. Davis always conditioned his invocation of his right to represent himself on the court providing to him the many resources that he requested; unless those tools were provided him, he did not *want* to represent himself.

Similarly, Mr. Davis proceeded to trial with counsel, and he makes no claim on appeal that counsel sought but was denied any tool necessary for his defense as set out in *Ake* or otherwise. He cannot show an *Ake* violation occurred in this manner.

As a result, Mr. Davis' claim of error turns on the relationship between his decision to relinquish his self-representation right under *Faretta* and the court's statements to Mr. Davis that were designed to apprise Mr. Davis of the dangers of proceeding without counsel—warnings that the court was duty-bound to make but that Mr. Davis says also incorrectly told him that he could not get the assistance he desired be provided without cost should he waive counsel. For the purposes of addressing this argument, therefore, this Court will presume, without deciding, that substantially misleading a defendant as to the rights he would have under *Ake* should he represent himself in some circumstances could constitute a *Faretta* violation.

### 2. Ake Principles Do Not Apply to the Requests Davis Made.

In *Ake,* 470 U.S. at 70, 74, 105 S.Ct. 1087, the Supreme Court addressed the State's obligations when a defendant is represented by counsel but is indigent and unable to pay for a psychiatric expert. *Ake* held that where the indigent defendant has made a showing that his sanity at the time of an offense is likely to be a significant factor at trial, the constitution requires the State to provide the indigent defendant with access to psychiatric examination and assistance necessary to prepare an effective defense based on the defendant's mental condition. This requirement is "grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness." *Id.* at 76, 105 S.Ct. 1087.

Guided by fundamental fairness, *Ake* said the constitutional focus is on "identifying the basic tools of an adequate defense or appeal . . . and . . . requir[ing] that such tools be provided to those defendants who cannot afford to pay for them." *Id.* at 77, 105 S.Ct. 1087 (internal citation and quotation marks omitted). To evaluate whether, and under what conditions, the "participation of a psychiatrist" was "important enough to preparation of a defense to require the State to provide an indigent defendant with access," *Ake* balanced three factors: (1) the private interest affected by the action of the State; (2) the governmen-

tal interest affected by providing the safeguard; and (3) the probable value of the additional or substitute procedural safeguards and the risk of an erroneous deprivation of the affected interest absent those safeguards. *Id.* Weighing these factors, *Ake* concluded that the State was required to provide a psychiatric expert once the defendant made a showing that his "mental condition [wa]s seriously in question" and "his sanity at the time of the offense [wa]s to be a significant factor at trial." [4] *Id.* at 83, 105 S.Ct. 1087.

Mr. Davis' reliance on *Ake* is misplaced. While *Ake* discusses broad principles that govern providing a defendant with access to "the basic tools of an adequate defense," 470 U.S. at 77, 105 S.Ct. 1087, the actual holding of the case is narrow: The State must supply a psychiatric expert for a represented but indigent defendant who has shown that his mental condition was seriously in question and his sanity at the time of the offense will be a significant factor at trial. As the State notes, this holding is inapplicable to Mr. Davis' situation for multiple reasons, many of which are relevant, and dispositive, here.

### 3. Mr. Davis Did Not Show Another Expert was Necessary.

■ First, the State notes, no subsequent United States Supreme Court case has extended *Ake* to experts other than psychiatric experts at trial, and Mr. Davis' various requests encompassed many resources in addition to a psychiatric expert at trial. While this is true, the majority of federal and state courts that have addressed this issue since *Ake* have concluded that the reasoning underlying *Ake* also

would apply to other types of experts *if* the required showing is made that the issue the expert is to address will be a significant factor at trial on a key issue. *See, e.g., Terry v. Rees,* 985 F.2d 283, 284 (6th Cir.1993) (pathologist); *Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir. 1987) (hypnotism expert); *Moore v. State,* 390 Md. 343, 889 A.2d 325, 338 (2005) (DNA analysis); *Ex Parte Moody,* 684 So.2d 114, 119 (Ala.1996) (holding *Ake* applicable generally to non-psychiatric experts). *But see O'Dell v. Commonwealth,* 234 Va. 672, 364 S.E.2d 491, 499 (1988) (holding *Ake* does not extend to funding for forensic experts).

This Court concurs that where the required showing of significance and necessity is made, *Ake*'s rationale may extend to non-psychiatric experts in the appropriate case. This is not such a case, however. Mr. Davis did not tell the court at the time of the hearing complained of that he needed the State to provide the assistance of an expert on a significant trial issue. In his other motions, he mentioned experts with a measure of specificity only three times: On the eve of trial, he said he wanted an expert on "Dissociative Identity Disorder (DID)" and on the effects of several prescription drugs he had taken; during the presentation of evidence at his trial, he requested an "expert witness in regards to involuntary intoxication;" and in an earlier motion, he said he needed unspecified "experts in medical drugs." At no time did he offer any basis other than speculation to believe that these requests concerned significant issues at trial, nor did he show that these conditions would have been significant to his defense.

---

**4.** The defendant in *Ake* had satisfied this test because, among other reasons, his sole defense was that of insanity, he behaved so bizarrely at arraignment that the court ordered a competency examination, and he was initially deemed incompetent to stand trial and was permitted to proceed only after taking large doses of sedative drugs. 470 U.S. at 86, 105 S.Ct. 1087.

To the contrary, Mr. Davis was examined by a psychologist prior to trial. This psychologist also testified on Mr. Davis' behalf in the penalty phase. Although he was obviously available to do so, Mr. Davis' psychologist did not provide testimony supporting an involuntary intoxication defense or that Mr. Davis was suffering from DID, however.[5] Mr. Davis failed to make the required showing of a mental condition that was seriously in question that was to be a significant issue at trial and as to which he was denied expert assistance. *See Ake,* 470 U.S. at 82–83, 105 S.Ct. 1087.

### 4. Mr. Davis Made No Showing Supporting Extending Ake to Tools Other than Experts.

■ Mr. Davis argues that *Ake* requires the State to furnish a self-represented defendant with tools for a defense beyond merely the provision of experts at trial, as was the case in *Ake.* He does not cite authority to support this proposition, however. This Court's independent research also has not identified cases in which a showing was made sufficient to require provision of non-expert defense tools of the kind Mr. Davis sought from the trial court under *Ake.* Two older state court decisions suggest that, were a particularized showing of importance and substantial need made, the principles underlying *Ake* might require making other types of essential tools available in a particular case. *See, e.g., State v. Rogers,* 313 Or. 356, 836 P.2d 1308, 1315 (1992) (Defendant "failed to establish the probable value to him of the public opinion poll in light of the extensive *voir dire* provided or that there was a significant risk of error in the proceedings without the poll"); *State v. Hickey,* 317

N.C. 457, 346 S.E.2d 646, 654 (1986) ("In the present case, the defendant has failed to make a threshold showing of specific necessity for the assistance of an investigator" into background of key witness for the state).

Apart from *Ake,* prior Supreme Court cases have recognized that in some circumstances the Constitution requires the provision of a free transcript on appeal, *Griffin v. Illinois,* 351 U.S. 12, 19–20, 76 S.Ct. 585, 100 L.Ed. 891 (1956), competent counsel at trial, *Gideon v. Wainwright,* 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and on direct appeal, *Douglas v. California,* 372 U.S. 353, 358, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and, for prison inmates, the right to reasonable access to a law library or adequate assistance from persons trained in the law, *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

None of these cases would entitle Mr. Davis to the "tools" he says were not provided. Mr. Davis' generalized requests concerned trial preparation, not appeal as in *Griffin* and *Douglas.* He had counsel at trial whom he wanted to be rid of not because they were not competent but because they refused to allow him to decide the legal strategy to employ in his case. While Mr. Davis did complain that he wanted more library time generally, he conceded in a motion that he already had access to a law library and never made a particularized showing to the court why the access he had was insufficient or whether the matters he needed to research were significant to his defense, which, in any event, was being handled at that time by counsel.

This Court does not mean to suggest that a defendant never could show a right

---

**5.** The expert who testified for Mr. Davis, Dr. Mandracchia, offered extensive testimony about Mr. Davis' childhood sexual and physical abuse and about the other mental conditions Mr. Davis developed and that the doctor believed contributed to his conduct.

to tools other than an essential expert, a competent attorney and free transcript on appeal, or sufficient access to legal research facilities. In a particular case, a defendant may be able to make the kind of particularized showing required by *Ake*. Mr. Davis has not cited any case holding that *Ake* principles require provision of the generalized kinds of "tools" he said he wanted the court to grant him without cost, however. Much less did he make a particularized showing of an issue seriously in question that was likely to be significant at his trial and for which he had shown the kind of need discussed below.

### 5. No Showing Was Made of a Need for Other Assistance.

Even when requesting a defense "tool" recognized under *Ake* or other authority, a defendant must make the required showing of need and significance under *Ake*. Mr. Davis' failure to do so is a fundamental bar to his claim on appeal. Absent such a showing, the trial court was correct in telling him that the State was not required to provide him with his own investigator and that he would have to come up with the funds for most of the "tools" he wanted.

While Mr. Davis made many motions seeking one or more general assistants or investigators who could go talk with and depose witnesses in his neighborhood and elsewhere who might be able to support a suppression motion or otherwise be helpful at trial, he failed to state facts with any particularity indicating what the investigator might uncover or how what the investigator found was important to an issue that reasonably could be expected to be significant at his trial. In effect, he wanted the state to supply a personal assistant or paralegal who would follow Mr. Davis' strategy decisions. It appears more to have been a hope that if enough people were questioned, something good would be found, rather than a situation, as in *Ake*, where the need for an expert was clear and its relevance to a significant trial issue evident.

Similarly, Mr. Davis' request for general access to photocopies, a typewriter, a VCR, a telephone and so forth was accompanied only by the undeveloped assertion they would constitute help he would need for trial; he failed to couple these requests with facts as to why provision of such tools would be relevant to the issues before the trial court.

Recognizing this deficiency, Mr. Davis suggests on appeal that it was the trial judge's burden to show that the various types of assistance requested by Mr. Davis were *not* necessary to his defense. This is contrary to *Ake* itself, which makes it clear that it is defendant who must make a "preliminary showing" that the basic tools he is requesting are "important enough to preparation of defense" for the State to be required to provide them. *Ake*, 470 U.S. at 74, 77, 105 S.Ct. 1087.

Later federal and state decisions have explicated how this showing must be made; the prevailing test requires the defendant to show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir.1987). This approach has been recognized by a host of jurisdictions. *See, e.g., Page v. Lee*, 337 F.3d 411, 416 (4th Cir. 2003); *Williams v. Collins*, 989 F.2d 841, 845–46 (5th Cir.1993); *Little*, 835 F.2d at 1244 (8th Cir.1987); *Moore*, 390 Md. 343, 889 A.2d 325 at 339; *State v. Apelt*, 176 Ariz. 349, 861 P.2d 634, 651 (1993); *Crawford v. State*, 257 Ga. 681, 362 S.E.2d 201, 206 (1987); *Cade v. State*, 658 So.2d 550, 554 (Fla.Dist.Ct.App.1995); *State v. Tou-*

*chet,* 642 So.2d 1213, 1216 (La.1994); *Taylor v. State,* 939 S.W.2d 148, 152 n. 3 (Tex.Crim.App.1996). This Court joins them.

It is not up to the judge to decide what the defense will present. Only defendant and his counsel can make that choice. For this reason, *Ake* provides that a defendant may request an *ex parte* hearing at which he or she can present how the sought-after evidence or assistance will support defendant's trial strategy. *Ake,* 470 U.S. at 82–83, 105 S.Ct. 1087 ("When the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent").

In *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court made clear that this requirement specifically is applicable to requests for investigators. It rejected a request of defendant to supply a criminal investigator, reaffirming that "undeveloped assertions that the requested assistance would be beneficial" are insufficient to support a finding of a constitutional right to state funding.[6] For similar reasons, this Court has rejected an *Ake* request lacking in specificity. *See State v. Clemons,* 946 S.W.2d 206, 222 (Mo. banc 1997) (to qualify under *Ake,* a defendant "must allege facts, not state mere legal conclusions or theories"). *See also Martinez v. Court of Appeal of California, Fourth Appellate Dist.,* 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (a trial court "is under no duty ... to perform any 'legal' chores for the defendant").

Mr. Davis raises no claim on appeal that he was denied an ex parte hearing [7] and never otherwise made such a particularized showing that he needed assistance from an investigator to develop specific evidence on a significant trial issue as opposed to hoping someone would provide him the general assistance and research that, in fact, counsel was then providing. The trial court was correct in telling Mr. Davis that it was not required to provide someone to perform as his investigative assistant and could not make someone work for free.[8]

### 6. Application of Ake To Defendants who Represent Themselves.

 Finally, and importantly, Mr. Davis's claim is not encompassed within *Ake* because Ake was represented by

---

6. In *Caldwell* the United States Supreme Court did not address the broader question of whether, had a specific showing been made, it would have extended the application of *Ake* beyond experts to other tools of the defense but instead simply noted that no showing had been made.

7. Although in a June 2007 motion Mr. Davis says that if there is a hearing where he reveals the facts that he is interested in discovering he would like the prosecutors to be excluded, he never noticed such a hearing nor did he request at the October 2007 hearing that he be permitted to discuss these issues with the court either openly or ex parte in a closed session, despite the court's request that Mr. Davis tell the court what exactly he was requesting from the court.

8. As to Mr. Davis' requests for a typewriter, VCR, DVD player, telephone, the right to make a set number of "copies," transcripts, photocopies of exhibits, copies of motions, and "law books not in the law library," he did not specify why he needed these or how they related to an issue seriously in question that was to be a significant matter at trial. Mr. Davis never showed that there was a reasonable probability both that any of the things he sought would be of assistance to his defense and that denial of them would result in a fundamentally unfair trial. Instead, he seemingly wanted to bank these tools so he would have them on hand should he need them. This is not the kind of assistance that *Ake* or the other cases require the court to provide.

counsel and it was *counsel* who sought the funds for or appointment of a psychiatric expert. Here, Mr. Davis does not claim that the public defender system did not have the funds to provide him with access to the kinds of investigative and trial preparation tools he desired. Rather, Mr. Davis sought to represent himself and claimed that *Ake* requires not just that he be provided the basic tools for a defense but also that he be provided them personally rather than through counsel.

Nothing in *Ake* indicates that the State must offer a defendant his choice of whether to receive these tools through counsel or himself. Indeed, *Ake* suggests to the contrary. At the same time it said that the State may be required to provide a psychiatric expert in some circumstances, *Ake* cautioned that an indigent defendant does not have a "constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." 470 U.S. at 83, 105 S.Ct. 1087. Instead, the "concern is that the indigent defendant have access to a competent psychiatrist," and *Ake* left "to the State the decision on how to implement this right." *Id.*

Given this language, it is perhaps not surprising that few courts even have considered applying *Ake* principles in the self-represented litigant context. In *Moore*, 889 A.2d at 329 & n. 3, the indigent defendant had only enough assets to retain counsel and then sought provision of a DNA expert from the state. The Maryland Court of Appeals held that it was permissible to tie the provision of the "basic tools of an adequate defense" to provision of appointed counsel so that if the indigent defendant declined to accept state-provided counsel, he also waived state provision of *Ake* tools—in that case, a DNA expert. *Moore*, 889 A.2d at 343–44.

As Mr. Davis notes, one pre-*Ake* state case recognized an indigent defendant's right to additional state-furnished resources despite the fact that the indigent defendant had retained private counsel hired by his mother and rejected appointed public defenders. *English v. Missildine*, 311 N.W.2d 292, 293–94 (Iowa 1981). *English* is not persuasive authority that there is a federal constitutional rather than a prudential reason for so providing; it pre-dates *Ake* and instead of grounding the right to defense tools in fundamental fairness under the Due Process Clause, as had *Ake*, *English* read a right to the resources in the Sixth Amendment. *Id.* The remaining cases Mr. Davis cites purporting to bolster the notion that *Ake* gives a self-represented litigant the right to all tools that are provided through counsel are rooted in a state statute or constitutional provision or independent federal right rather than in *Ake*. *See United States v. Sarno*, 73 F.3d 1470, 1491–92 (9th Cir. 1995) (not citing *Ake*, court notes right of self-represented litigant to some resources balanced against security considerations but finds that access was not unduly restricted); *State v. Burns*, 4 P.3d 795, 799–800 (Utah 2000) (invoking Utah indigent defense statutes); *State v. Silva*, 107 Wash.App. 605, 27 P.3d 663, 669–77 (2001) (invoking Washington state constitutional provision).

This Court has no occasion today to address what additional situations might require the provision of certain additional basic tools of defense to a defendant who decides to represent himself, for a showing sufficient to take such a significant step has not been made here. The burden was on Mr. Davis to make a particularized showing that there was a reasonable probability both that the tools he requested would be of assistance to his defense and that denial of such tools would result in his trial being fundamentally unfair. *Moore*, 809 F.2d at 712. He failed to make any

such showing.[9] Therefore, he has failed to show that the court erred in rejecting his requests and in stating he would not be entitled to the funding he sought should he proceed without counsel. As such, Mr. Davis' *Faretta* argument, based on his claim that the trial court misinformed him as to his entitlements under *Ake*, also fails.

### B. Mr. Davis Was Not Denied His Right to Testify

■■■■ Next, Mr. Davis claims that the trial court plainly erred in "coercing" his decision not to testify during the guilt phase because, Mr. Davis maintains, the court misled him by telling him that if he testified, he would have to do so by an-swering the questions put to him by counsel rather than in narrative form. This argument is without merit.[10]

■■■■ A criminal defendant has a constitutional right to testify in his own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). A defendant knowingly and voluntarily may waive the right to testify. *Smith v. State*, 276 S.W.3d 314, 317 (Mo. App.2008).

■■■■ Here, the record shows that Mr. Davis was apprised fully of his right to testify and made the knowing and voluntary decision to waive that right when the

9. The dissent cites *People v. Blair*, 36 Cal.4th 686, 31 Cal.Rptr.3d 485, 115 P.3d 1145, 1175 (2005), to support its conclusion that the Sixth Amendment requires the State to provide an investigator, a runner and a variety of other resources to a defendant. *Blair* does hold that the provision of such services, required by statute in all capital cases in California, also is required by the Sixth Amendment, although it cites no federal cases to support this constitutional interpretation. Further, it notes that a court need not provide just any resources that defendant requests; rather, "the crucial question underlying all of defendant's constitutional claims is whether he had reasonable access to the ancillary services that were reasonably necessary for his defense." *Id.* The court determined that Blair failed to show that the tools of which he alleged he was deprived were reasonably necessary to his defense. This Court reaches the same conclusion in this case.

Moreover, despite the dissent's suggestion that Mr. Davis could not know what he wanted until he found it and, therefore, he should be provided assistance without first having to demonstrate the necessity for it or its importance at trial, that is not the law. The burden is on the defendant to show necessity, not the court to show a lack of necessity. Mr. Davis' failure to show the trial court that there existed a reasonable probability both that a particular tool would be of assistance to his defense and that denial of that assistance would result in a fundamentally unfair trial supported the trial court's statement to him that the court would not pay for an open-ended request for an investigator. *See, e.g., Moore*, 809 F.2d at 712. Further, Mr. Davis withdrew his request to represent himself and, as a represented person, it would have been simple for counsel to make a record both that there was a reasonable probability that the tools Mr. Davis requested would be of assistance to his defense and that denial of those tools would result in a fundamentally unfair trial, if that were the case.

10. Although he initially conceded that this point was unpreserved, Mr. Davis reversed positions in his reply brief, arguing that this claim of error was preserved because in a motion filed shortly before trial (titled "motion by pro se defendant to state his objections and be heard in writing due to public defenders and court not allowing pro se (motions,) (complaints,) (suppression grounds,) to be heard in court, made record of and ignored and covered up"), Mr. Davis had stated, "How can I not be a witness at my own trial and be allowed to have other witnesses and evidence to support my testimony?" To preserve a claim of error, a defendant must, at a minimum, make an objection contemporaneous in time to the purported error. *State v. Stepter*, 794 S.W.2d 649, 655 (Mo. banc 1990) ("To preserve a claim of error, counsel must object with sufficient specificity to apprise the trial court of the grounds for the objection"). Asking a rhetorical and convoluted question in a pre-trial motion is not sufficient.

court informed him that, as a matter of "attorney-client ... strategy," defense counsel would decide precisely what questions counsel would ask Mr. Davis (as, of course, would the prosecutor). Mr. Davis inveighs against the court's ruling that he would not be permitted to testify in narrative form, calling it "unnecessarily restrictive." The manner of a defendant's right to testify may be restricted, however, to accommodate other "legitimate interests in the criminal trial process." *Rock*, 483 U.S. at 55, 107 S.Ct. 2704 (internal citation and quotation marks omitted). Although such restrictions "may not be arbitrary or disproportionate to the purposes they are designed to serve," *id.* at 56, 107 S.Ct. 2704, requiring the traditional question-and-answer technique of eliciting testimony—one of the most universal aspects of trial procedure—did not impose an unnecessarily restrictive rule, let alone one that is arbitrary or disproportionate.

The court made clear that Mr. Davis was free to testify but simply required that he do so like all the other witnesses in his trial—by answering questions asked by counsel. As *Rock* intimates, "Numerous state procedural and evidentiary rules control the presentation of evidence and do not offend the defendant's right to testify." *Rock*, 483 U.S. at 55 n. 11, 107 S.Ct. 2704. Examining witnesses pursuant to the traditional question-and-answer format is one such rule. Of course, "there is no ironclad rule prohibiting narrative testimony," *State v. Couch*, 256 S.W.3d 64, 71 (Mo. banc 2008), so the court, in its discretion, could have permitted Mr. Davis to testify in the narrative form, but it did not abuse its discretion in requiring a question-and-answer format.

■ The court also did not misinform Mr. Davis by telling him that he could not force his own counsel (or that for the State) to ask particular questions and not others. While the decision *whether* to exercise the right to testify rests exclusively with the defendant, *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the tactical decisions as to *how* to conduct examination of witnesses, including that of the defendant, lie with counsel.[11] Mr. Davis does not cite any authority holding to the contrary. "This Court has long held that the 'entire subject of the manner of the examination of witnesses in open court is confided, of necessity, to the sound discretion of the trial judge.'" *Couch*, 256 S.W.3d at 72, *quoting, Daudt v. Steiert*, 205 S.W. 222, 224 (Mo. 1918). It was not plain error for the trial court to have informed Mr. Davis that, should he testify, he would have to answer questions of his counsel's choosing according to the question-and-answer method.

### C. No Error in Failing to Strike Juror for Cause

■ Mr. Davis maintains that the court erred in failing to sustain a motion to strike Mr. Powell for cause when his voir dire answers allegedly demonstrated he was unwilling to give meaningful consideration to the mitigating evidence that Mr. Davis would introduce during the penalty phase. This, Mr. Davis says, violated the Eighth Amendment requirement "that the jury be able to consider and give effect to a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (internal citation and quotation marks omitted).

---

11. *State v. Spiller*, 778 S.W.2d 825, 826 (Mo. App.1989) ("The general rule is that the extent of cross-examination and the subjects covered must, in virtually every case, be left to the judgment of counsel"); *see also* Wor-thington v. State, 166 S.W.3d 566, 578 (Mo. banc 2005) ("Defense counsel has wide discretion in determining what strategy to use in defending his or her client").

 "The trial court's ruling on a challenge for cause shall not be disturbed on appeal unless it is against the weight of the evidence and constitutes a clear abuse of discretion." *State v. Johnson,* 244 S.W.3d 144, 158 (Mo. banc 2008). In a capital case, the standard for determining when a prospective juror may be excluded for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation marks omitted). For example, if it "appears that a juror cannot consider the range of punishment, apply the correct burden of proof, or follow the court's instructions in a murder case, then a challenge for cause will be sustained." *Johnson,* 244 S.W.3d at 158. "The determinative question is not whether a venireman has an opinion. It is whether that opinion is of such intensity and holds such sway over the mind ... that it will not yield to the evidence presented at trial." *State v. Leisure,* 749 S.W.2d 366, 372 (Mo. banc 1988).

The court did not abuse its discretion in overruling Mr. Davis' motion to strike Mr. Powell because the latter's views about the persuasiveness of childhood experience evidence did not constitute a substantial impairment of his ability to perform his duties as a juror. In his juror questionnaire, Mr. Powell stated that he believed childhood experiences somewhat affect later behavior. He was of the view that an adult should "know the difference between right and wrong and killing a person and not killing a person," but he maintained throughout questioning that he was willing to "look at" and consider evidence of childhood experience. Mr. Powell agreed that the importance of evidence of childhood experiences was a matter of weight. He never indicated that he would ignore such evidence; he simply was not inclined to give it much credit in the usual case.

 Willingness to give a piece of evidence meaningful consideration does not mean a juror must agree during voir dire that he is likely to find a particular type of evidence persuasive. Juror "qualifications are not conclusively determined by any single response, but from the entire voir dire examination." *State v. Lyons,* 951 S.W.2d 584, 591 (Mo. banc 1997). The totality of Mr. Powell's answers on his pretrial questionnaire and during voir dire show that he was willing to meaningfully consider mitigating childhood experience evidence proffered by Mr. Davis. *Cf. State v. Simmons,* 737 S.W.2d 473, 473–74 (Mo.App.1987) (no error where court denied strike of venire person who initially expressed a tendency to give greater weight to police officer's testimony, but upon further questioning demonstrated an ability to evaluate all of the testimony).

### D. Evidentiary Rulings

 Mr. Davis next argues that the trial court erred in admitting into evidence footage from the sex tapes Mr. Davis made, the still photographs made from the tapes, testimony describing the contents of the tapes, and Mr. Davis' videotaped confessional statements because these items were "excessively prejudicial duplicative evidence."

 Evidence must be relevant to be admissible. *State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002). Relevancy has two-tiers: logical and legal. *Id.* Evidence is logically relevant " 'if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue

of the case.'" *State v. Tisius,* 92 S.W.3d 751, 760 (Mo. banc 2002), *quoting, State v. Mathews,* 33 S.W.3d 658, 661 (Mo.App. 2000). Mr. Davis concedes the logical relevance of the evidence he claims was admitted improperly.

Evidence that is logically relevant is not necessarily admissible. The probative value of logically relevant evidence must be weighed against the risks it poses of unfair prejudice, cumulativeness, confusion of the issues, misleading the jury, undue delay or waste of time. *Anderson,* 76 S.W.3d at 276. Legally relevant evidence is evidence that survives this balancing and is admissible. By contrast, evidence is not legally relevant and, therefore, must be excluded if its costs outweigh its benefits. *Id.* "The determination of legal relevance ... rests within the sound discretion of the trial court." *Tisius,* 92 S.W.3d at 760.

Here, the trial court acted well within its discretion in determining that the risks of unfair prejudice were not great enough to outweigh the probative value of the disputed evidence. While the videotape footage and still photographs made from that footage were highly disturbing, they were first-hand recorded accounts of the crimes charged in this case and so were of supreme probative value. They were potentially prejudicial, but that prejudice arose from the gruesome nature of Mr. Davis' crimes, not from any action of the State in the method of presenting the footage and photographs. The court was within its discretion in determining that the probative value of this evidence outweighed its prejudicial effect. *See State v. Johnson,* 930 S.W.2d 456, 462–63 (Mo.App.1996)

("To exclude graphic evidence solely because it is graphic would deprive the State of evidence when it needs it the most: the evidence would be inadmissible to prosecute what are typically the most serious crimes").

As to the officers' testimony describing the events on the tapes, Mr. Davis offers no evidence that it inflamed unfair prejudice. The officers simply described additional events on the tapes in general terms in order to avoid the more prejudicial alternative of playing all the footage in its entirety. Similarly, Mr. Davis makes no showing that the court abused its discretion in allowing footage of Mr. Davis' inculpatory statements made during the police interview. Such admissions are highly relevant. They do not become unfairly prejudicial simply because they hurt Mr. Davis' case.[12]

For similar reasons, this Court rejects Mr. Davis' argument that the evidence was unduly cumulative. In an effort to limit the jury's exposure to the entirety of the disturbing footage on the tapes, the jury was only shown a 90–minute edited version of the over seven and one-half hours of film. The officers' testimony about the contents of the tapes went to a description of the footage that the jury was not shown. Accordingly, these two strands of evidence were not duplicative. While the still photographs the State used were taken from the videotape footage, their use permitted the State to avoid having to revisit particular segments of footage during opening statement and closing argument. Finally, Mr. Davis' statements did not duplicate the above evidence. In those interviews, Mr. Davis admitted some culpability but

12. The State argues that Mr. Davis' objections to the admission of his inculpatory statements to police and Detective Howe's testimony regarding the contents of the tapes were not preserved properly and so should be reviewed for plain error. Rule 30.20. This Court concludes that the challenged evidence was admissible regardless of which standard of review is applied.

was evasive or misleading as to his responsibility for some of the crimes with which he ultimately was charged.

### E. Court Commenting about the Evidence

■ A number of the instructions submitting particular counts included a reference to the particular tape on which the alleged crime was depicted. For instance, Instruction No. 13 stated:

> As to Count IV, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about May 14, 2006, . . . the defendant touched the breast of Marsha Spicer *as depicted in "Tape B"*
>
> . . . .

(emphasis added).[13] This instruction format was used to assist the jury in differentiating the numerous offenses submitted, as contemplated by the Notes on Use for MAI–CR 3d 304.02, which provide, in pertinent part:

> (c) Multiple Offenses—Same Victim, Short Period of Time.
>
> If the defendant is charged with more than one crime involving the same victim on the same day, the time should be shown on each instruction as "at about [*time of day or night*] on" or "between the hours of [*time of day or night*] on" a specific date.
>
> . . . .
>
> If it is impossible to fix the occasion of the offense by time or date, the instruction should be modified by the Court to identify the occurrence by some other reference.

MAI–CR 3d 304.02(c).

Mr. Davis argues that these references were the equivalent of the trial court telling the jurors that the evidence referenced in the instruction would provide proof of the charged offense. While trial courts are barred from conduct during trial that can be construed as demonstrating a belief that the defendant is guilty, *State v. Davis,* 653 S.W.2d 167, 177 (Mo. banc 1983), *overruled on other grounds by, Kuyper v. Stone County Comm'n,* 838 S.W.2d 436, 439 (Mo. banc 1992), these references did not constitute such conduct.

As the State notes, the references to "Tape B" and similar references in the verdict directors were appropriate under the Notes on Use direction to "identify the occurrences by some other reference." Merely referencing time and date would have been unworkable due to discrepancies in the accuracy of the time and date stamp on the camera used by Mr. Davis. Mr. Davis has not suggested another method by which the jurors could have been informed how to determine which crime was being submitted in which verdict director. Further, Instruction No. 3 advised the jury that the court "does not mean to assume as true any fact referred to in these instructions but leaves it to you to determine what the facts are." This language would have acted as a safeguard, reducing the chance the jury assumed that the charged offenses were in fact depicted on the tapes simply because the instructions referred to the tapes as depicting the crimes. *Mathes v. Sher Express, L.L.C.,* 200 S.W.3d 97, 110 (Mo.App.2006) ("This instruction reduces the chances of a jury improperly concluding that a controverted fact has been assumed by the court to be true") (internal citation and quotation marks omitted).

Moreover, the evidence of Mr. Davis' guilt, set out in detail above, was so over-

---

13. In particular, Counts IV through IX, XIII through XXIII and XXV through XXVI, submitted in Instructions Nos. 13, 15, 17, 19, 21, 23, 31, 33, 35, 37, 39, 41, 43, 35, 47, 49, 51, 55 and 57, contained this kind of reference.

whelming that the references to the tapes in which the crimes were recorded in the verdict directors could not have had a decisive effect on the jury's determination of guilt. The entirety of the portions of the tapes played for the jury provided substantial proof of each of the charged offenses and, in closing argument, Mr. Davis conceded his guilt of all the sex crime counts and assault counts of which he was convicted, only contesting the first-degree murder count and the assault count on which he obtained a "not guilty" verdict. "Overwhelming evidence of guilt may lead an appellate court to find that a defendant was not prejudiced." *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007). Because overwhelming evidence established Mr. Davis' guilt for these offenses, any error in use of the "as depicted in" references to the tapes in the verdict-directing instructions was not prejudicial.

*F. Verdict Director Instructions Were Proper*

Mr. Davis also argues that the instructions did not inform the jury adequately that it had to find unanimously that the State proved each element of each crime submitted in order to find against him as to that crime. The same point was raised and rejected in *State v. Johnson*, 284 S.W.3d 561, 575 (Mo. banc 2009). *Johnson* held that the jury instructions as a whole sufficiently advised the jury that its verdicts on each count must be unanimous as to each element and additional instructions on the requirement of unanimity were not necessary.

The Court reaffirms that holding. The jury was instructed, for example, that it could not find Mr. Davis guilty of first-degree murder, "unless [it found] and believe[d] from the evidence beyond a reasonable doubt each and all of these propositions." The jury also was instructed:

You will then discuss the case with your fellow jurors. Each of you must decide the case for yourself but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Your verdict, whether guilty or not guilty, must be agreed to by each juror. Although the verdict must be unanimous, the verdict should be signed by your foreperson alone.

When you have concluded your deliberations, you will complete the applicable form to which you unanimously agree and return it with all the unused forms and the written instructions of the Court.

As this Court noted in *Johnson*, this language was sufficient to apprise jurors that they must find unanimously every element of a particular offense beyond a reasonable doubt to return a guilty verdict on that offense.

*G. Motion to Quash Information*

Mr. Davis next argues that the court should have quashed the information because it failed to list statutory aggravators. In support, Mr. Davis cites *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). As this Court has noted in numerous prior cases, neither *Apprendi* nor other cases require that the charging document list aggravating circumstances; the notice of aggravating circumstances under section 565.005.1 was adequate to notify Mr. Davis that he was charged with a capital offense. *See, e.g., State v. Johnson*, 284 S.W.3d 561, 589 (Mo. banc 2009); *State v. Johnson*, 207 S.W.3d 24, 48 (Mo. banc 2006); *State v. Gill*, 167 S.W.3d 184, 194 (Mo. banc 2005). The trial court did not err in declining to quash the information.

*H. Jury Instructions regarding Effect of Mitigation Evidence*

Next, Mr. Davis argues that *Apprendi* requires that juries in capital cases be instructed that the State bears the burden of proof during the section 565.030.4(3) step of determining whether mitigating circumstances outweigh aggravating circumstances. This Court reaffirms its prior holding that there is no requirement that the determination of the weight of mitigating and aggravating circumstances be established by the State beyond a reasonable doubt. *Johnson*, 284 S.W.3d. at 587–89.

*I. Independent Proportionality Review*

██ Finally, although Mr. Davis does not argue on appeal that his sentence is disproportionate to his crime, this Court has an independent obligation to conduct a proportionality review of the imposition of the death penalty in his case. *State v. Edwards*, 116 S.W.3d 511, 548 (Mo. banc 2003). Section 565.035.3 requires that all death penalty cases be reviewed for proportionality. *State v. McLaughlin*, 265 S.W.3d 257, 277 (Mo. banc 2008). Under section 565.035.3, this Court must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . .;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

This Court has undertaken an independent review of the record and does not find that the sentence of death was imposed under the influence of passion, prejudice or some other arbitrary factor, nor has Mr. Davis identified any such factor to the Court. The Court further finds that the evidence supports the jury's determinations: (1) that Mr. Davis had prior assaultive convictions for forcible rape and forcible sodomy; (2) that the murder was committed with depravity of mind because the crime involved binding Ms. Spicer, subjecting her to repeated acts of gruesome physical and sexual torture with the purpose of promoting her death, and that Mr. Davis killed or aided in killing Ms. Spicer while she was bound helplessly, thereby exhibiting a callous disregard for human life; and (3) that Mr. Davis was in the course of perpetrating the rape of Ms. Spicer when he murdered her.

To determine whether a sentence of death is excessive or disproportionate in comparison to the penalty imposed in similar cases, "[s]ection 565.035.3 requires consideration of all factually similar cases . . . including those resulting in a sentence of life imprisonment without the possibility of probation or parole." *State v. Anderson*, 306 S.W.3d 529, 545 (Mo. banc 2010) (Breckenridge, J., concurring in part and concurring in result in opinion joined in this regard by a majority of the court).[14] This Court adheres to a familiar inquiry in applying this approach: It "continue[s] doing what it now does in regard to cases in which death was imposed—review them to determine whether the sentence of death is disproportionate in light of the crime,

---

**14.** *Compare State v. Deck*, 303 S.W.3d 527, 550–53 (Mo. banc 2010) (no majority opinion on this issue as Judges Breckenridge, Stith and Wolff vote in favor of consideration of both cases in which death and life imprisonment were imposed, Judges Fischer and Russell and Chief Justice Price vote in favor of consideration only of cases in which death was imposed, with Judge Teitelman concurring in result only, thereby leaving only a plurality opinion on both sides of this issue).

the defendant and the strength of the evidence ... but ... include[s] similar cases in which a life sentence was imposed in that analysis." *State v. Deck,* 303 S.W.3d 527, 560 (Mo. banc 2010) (Stith, J., concurring).

The separate opinion of Judge Fischer suggests that because the legislature did not change section 565.035.3 once this Court, beginning in 1994, began determining proportionality only in relation to cases in which death was imposed, it must have agreed with this approach. But, as discussed in detail in the concurring opinion of Judge Stith in *Deck,* 303 S.W.3d at 555–63, neither did the legislature change the statute during the 16–year period from 1978 until 1994 when this Court applied section 565.035.3 to require that it consider similar cases in which either death or life in prison without parole were imposed (except making a change in 1984 that reinforced the requirement to consider both types of cases). *Id.* at 556. If there was an error in this Court not waiting for a legislative reaction to its cases before changing its interpretation of the statute, it occurred in 1994, when this Court *sub silencio* began not considering cases in which life imprisonment was imposed, not in *Deck* or in *Anderson*'s return to this Court's original jurisprudence.

The separate opinion of Judge Fischer also suggests that there is some significance to the fact that this is the first time that an opinion denominated the "principal opinion" has interpreted the statute as requiring consideration of cases in which either death or life imprisonment are imposed. But in *Anderson,* a majority of the Court determined that this is what the

statute requires. The scope of proportionality review is settled; Judge Breckenridge's concurring opinion, in which Judges Wolff, Stith and Teitelman joined as to the proportionality issue, established the governing law on this matter.[15] *Anderson,* 306 S.W.3d at 545–47 (Breckenridge, J., concurring in part and concurring in result); *Id.* at 551 (Wolff, J., dissenting) (Judges Stith and Teitelman join in Judge Wolff's dissent).

■■■ In any event, this Court's analysis must be governed by the words of the statute. When the statute itself is clear, this Court need not speculate as to what the legislature's inaction means. *See, e.g., Hyde Park Housing P'ship v. Dir. of Revenue,* 850 S.W.2d 82, 84 (Mo. banc 1993) ("Where the language is clear and unambiguous, there is no room for construction"). Instead, this Court "must give effect to [the statute's] plain meaning." *Home Builders Ass'n of Greater St. Louis, Inc. v. City of Wildwood,* 107 S.W.3d 235, 239 (Mo. banc 2003). To attempt to derive meaning from what the legislature did *not* do is an exercise in conjecture that in this case is entirely unnecessary.

As set out in detail in the separate opinion of Judge Stith in *Deck,* 303 S.W.3d at 555–63 (Stith, J., concurring in result), section 565.035 requires that the Court "shall accumulate the records of all cases in which the sentence of death or life imprisonment without probation or parole was imposed" and requires that this Court consider all "other similar cases" in determining whether the sentence of death is excessive or disproportionate in light of the crime, the defendant and the strength of the evidence. As noted in *Deck,* 303

---

15. In *Anderson,* the contrary and minority view—that the scope of proportionality review is limited to similar cases in which the death penalty was imposed, thereby excluding similar cases in which life without the possibility of probation or parole was imposed—had the support only of Judge Fischer, Chief Justice Price and Judge Russell. *Anderson,* 306 S.W.3d at 544 (principal opinion).

S.W.3d at 559 (Stith, J., concurring in result), it would be pointless to require the Court to accumulate the records of cases in which life imprisonment was imposed just so it could put them to one side and not look at them when considering proportionality—the only purpose for which the cases were accumulated in the first place. *Id.* This Court considers both types of cases here.

After independently researching both death and life cases, this Court is hard-pressed to find anything in the case law similar to the appalling and gruesomely documented murder committed by Mr. Davis. This crime was unspeakable, Mr. Davis' conduct cold and calculating, and the evidence of guilt overwhelming. Ms. Spicer was beaten and sexually abused repeatedly before being smothered to death by Mr. Davis and his girlfriend for their sexual gratification. Many of these events, including the point of Ms. Spicer's death, were recorded on videotape by Mr. Davis himself.

This Court has affirmed sentences of death where the jury finds the defendant acted with a depraved mind in strangling or smothering the victim to death after raping or sodomizing or attempting to rape or sodomize the victim. *State v. Brown,* 902 S.W.2d 278, 283 (Mo. banc 1995); *State v. Mercer,* 618 S.W.2d 1, 3–4 (Mo. banc 1981). The death penalty has been imposed in many cases in which the defendant has murdered a victim in the course of, or just after, raping that victim. *See, e.g., State v. McLaughlin,* 265 S.W.3d 57, 260 (Mo. banc 2008); *State v. Kinder,* 942 S.W.2d 313, 320 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369, 375 (Mo. banc 1994). This Court also has affirmed sentences of death when the defendant has a prior conviction for a serious assaultive crime, such as rape. *See, e.g., State v.*

*Sidebottom,* 753 S.W.2d 915, 926, 927 (Mo. banc 1988).

## IV. CONCLUSION

The Court concludes unanimously that the sentence imposed here was not disproportionate to the strength of the evidence, the crime or the defendant and the majority of the Court concludes that, for the reasons set out in this opinion, no reversible error occurred. The judgment is affirmed as to both guilt and punishment.

BRECKENRIDGE, J., concurs; FISCHER, J., concurs in separate opinion filed; PRICE, C.J., and RUSSELL, J., concur in opinion of FISCHER, J.

TEITELMAN, J., concurs in part and dissents in part in separate opinion filed; WOLFF, J., concurs in opinion of TEITELMAN, J.

ZEL M. FISCHER, Judge, concurring.

I concur in the principal opinion except as to the proportionality analysis. I concur that Davis' capital sentence is proportional to his crimes. A comparison of similar cases in which the death penalty was imposed shows Davis' sentence is proportional and not imposed in a freakish or wanton manner. *See, e.g., State v. McLaughlin,* 265 S.W.3d 257 (Mo. banc 2008) (a conviction of first degree murder, rape and armed criminal action); *State v. Link,* 25 S.W.3d 136 (Mo. banc 2000) (a conviction of first degree murder, kidnapping and forcible rape); *State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996) (a conviction of first degree murder; the facts showed a sexual assault occurred during the commission of the crime).

For the first time in more than 17 years, in a principal opinion of this Court, proportionality review requires consideration of all "similar" cases including cases that resulted in a sentence of life imprisonment

without the possibility of probation or parole. This departure from the longstanding precedent of proportionality review requiring the consideration of "similar" cases resulting in a death sentence is in my opinion an inaccurate statutory interpretation. The principal opinion asserts that the requirement that this Court consider both life sentence and death sentence cases in its statutory proportionality review results from a plain reading of § 565.035, RSMo 2000. Although that statute requires this Court *to collect information* on such cases, the statute's explicit language, contrary to the inference drawn by the principal opinion, leaves to this Court's discretion *the use* to make of that information. The statute explicitly states that the Court shall have "whatever extracted information *the [C]ourt desires* with respect" to the information collected, and that the Court "shall include in its decision a reference to those similar cases which *it took* into consideration." Section 565.035.6, .5 (emphasis added). Nowhere is there "plain language" *requiring* this Court *to consider* both life sentence and death sentence cases in conducting its statutory review. *See* § 565.035.3, .5, .6.

As I noted in the principal opinion in *State v. Deck,* 303 S.W.3d 527, 552 (Mo. banc 2010) (citing *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993)), the circumstances concerning the appropriateness of capital punishment is a very serious and ongoing public concern. As such, it would be a rare scenario that the legislature would leave the holding in *Ramsey*—that review is of similar cases where death is imposed—unaddressed for 17 years. At this point, our legislature should readdress this issue to make it clear to the members of this Court what type of statutory proportionality review, if any, should be required.

Statutory proportionality review is not required by the Eighth Amendment to the United States Constitution. Eighth Amendment proportionality as defined by the United States Supreme Court evaluates a particular defendant's culpability for his crime in relation to the punishment that he has received. *Getsy v. Mitchell,* 495 F.3d 295, 305 (6th Cir.2007). It does not require a comparison of the defendant's sentence to that of similarly situated defendants. *Id.* Section 565.035.3 is an additional safeguard beyond the requirements of the Eighth Amendment. "By statutorily incorporating a form of comparative proportionality review that compares a defendant's death sentence to others who have also received a sentence of death, [a] death penalty regime actually adds an additional safeguard beyond the requirements of the Eighth Amendment." *Getsy,* 495 F.3d at 306. " 'Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison'; therefore, 'limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed' falls within this wide latitude." *Id.* (quoting *Williams v. Bagley,* 380 F.3d 932, 962–63 (6th Cir.2004)).

RICHARD B. TEITELMAN, Judge, concurring in part and dissenting in part.

I respectfully dissent from the principal opinion to the extent it holds that Mr. Davis knowingly and voluntarily waived his Sixth Amendment right to self-representation. Nearly all criminal defendants would be better served by accepting representation from an attorney rather than attempting to navigate the complexities of litigation on their own. Perhaps for that reason, trial courts are required to ensure that the defendant's waiver of counsel is made voluntarily with knowledge of the dangers associated with waiving constitu-

tional rights. Regardless of the wisdom of electing self-representation, the fact remains that self-representation is a constitutional right guaranteed to all defendants who unequivocally and voluntarily waive the right to counsel in a timely manner. *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Black,* 223 S.W.3d 149, 152 (Mo. banc 2007). Accordingly, the trial judge's explanation of the potential pitfalls of self-representation should be thorough and complete, but it should not serve as a means of dissuading a defendant from knowingly and voluntarily exercising his or her right of self-representation.

In this case, Davis made several motions requesting investigators and other assistance so that he could represent himself. In discussing the availability of funding in the event Davis represented himself, the trial court repeatedly emphasized the likely unavailability of funding and, at the end of the discussion, stated:

> I'm telling you up front, you understand, I have no power to do that. I can't force people to work for free. Do you understand that?

The clear implication of the court's statement is that if Davis elected to represent himself, then he would be wholly on his own, incarcerated with no assistance or funds to conduct even the most rudimentary investigation. The court's dire assessment of Davis' options in self-representation may well have been in Davis' best interests, but it also raised a substantial possibility that Davis improperly was dissuaded from exercising his constitutional right to self-representation.

The principal opinion concludes that Davis's claim for investigative assistance is not encompassed within *Ake* because nothing in *Ake* suggests that a state must offer a defendant the choice of whether to receive defense tools through counsel or him-self. The defendant in *Ake* was represented by counsel, and the issue of the state's obligation to provide funding for a self-represented defendant was not at issue. The Court's silence speaks to the facts of the case and does not imply that a defendant who exercises his or her Sixth Amendment right to self-representation thereby forfeits any of the baseline due process requirements established in *Ake.* To the contrary, courts have held that depriving a self-represented defendant of the means of presenting a defense violates the right of self-representation. *People v. Blair,* 36 Cal.4th 686, 31 Cal.Rptr.3d 485, 115 P.3d 1145, 1175 (2005). Therefore, a self-represented defendant may not be placed in the position of presenting a defense "without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense." *Id.*

The trial court's statements in this case clearly implied that if Davis elected self-representation, he very likely would be without the kinds of basic defense tools that are identified in *Blair* and that, as a matter of common knowledge, are necessary to defend against criminal charges. It is difficult to fault Davis for not unequivocally and unconditionally asserting the right to self-representation because the trial court had all but guaranteed that if Davis proceeded to represent himself, he would, as a practical matter, have no access to meaningful investigative assistance.

The principal opinion also rejects Davis' argument because he did not state with particularity facts indicating what the investigator might uncover or how that was important to an issue that reasonably could be expected to be significant at his trial. It is true that Davis did not state with particularity, in advance, the facts or information an investigator might uncover. But how could he? The need for an inves-

tigation of witnesses presupposes a lack of knowledge as to what the potential witnesses know. It would be difficult, if not impossible, for Davis to state, at the outset, particular facts demonstrating a specific need for an investigator. The difficulty of this task was compounded by the trial court's statements that incorrectly implied that if Davis elected self-representation, there would be no funding for him to investigate his case.

In this context, there is substantial doubt as to whether Davis knowingly and voluntarily waived his Sixth Amendment right to self-representation. Davis should be given the full opportunity to exercise his Sixth Amendment rights. I would reverse and remand.